Ronald A. **ZSCHALER**, Miron C. Malboeuf, Richard B. Stanley, Peter Weir, Sugarbush Village Estate, Inc., Sugarbush Condominiums & Properties, Inc., Sugarbush Village Transit, Inc., Castlerock Management Co., Inc. and STU, Inc., Plaintiffs,

v.

CLANEIL ENTERPRISES, INC., Sugarbush Resort Properties Services, Inc., Snowridge, Inc., d/b/a Sugarbush Resort, Sugarbush Resort Corporation, and Bev Ridge, Inc., Defendants.

No. 2:93–CV–276.

United States District Court,
D. Vermont.

March 31, 1997.

John Scott Cameron, Paterson & Walke, P.C., Montpelier, VT, Anthony Michael Lorusso, Loletta L. Darden, Deborah M. Utstein, Lorusso & Loud, Boston, MA, for Ronald A. Zschaler, Miron C. Malboeuf, Richard B. Stanley, Peter Weir, Sugarbush Village Real Estate, Inc., Sugarbush Condominiums & Properties, Inc., Sugarbush Village Transit, Inc., Castlerock Management Co., Inc. and STU, Inc.

Dennis Rudolph Pearson, Robert Francis O'Neill, Gravel & Shea, Burlington, VT, for Claneil Enterprises, Inc., Sugarbush Resort Properties Services, Inc., Snowridge, Inc., Sugarbush Resort Corp., And Bev Ridge, Inc.

Charles A. Harvey, Jr., Andrew M. Horton, Verrill & Dana, Portland, ME, for Sugarbush Resort Holding, Inc.

## OPINION AND ORDER

SESSIONS, District Judge.

This case involves allegations of federal antitrust violations, deceptive advertising, and other anti-competitive conduct with respect to lodging reservations, lodging accommodations, rental agency services, and property management in the Sugarbush Valley ski area in Vermont. Plaintiffs, individual owners of condominiums in the area and corporations involved in the rental and management of those and other condominiums, allege seven counts against Defendants: attempt to monopolize and monopoly leveraging in violation of the Sherman Act (Counts I and II); deceptive advertising in violation of the Lanham Act (Count III); unfair competition in violation of the Clayton Act (Count IV); common law unfair competition (Count V); false trademark registration (Count VI); and breach of fiduciary duty under 16 U.S.C. §§ 497 and 497b (Count VII).[1] Plaintiffs seek injunctive relief as well as compensatory and punitive damages. Pending before the Court are the parties' cross motions for summary judgment on Count III and Defendants' motion for summary judgment on all remaining counts. Jurisdiction is based on diversity.

## I. Factual Background

Sugarbush is a ski resort area located in Warren and Fayston, Vermont. Initially de-

---

1. Plaintiffs moved to amend their Complaint on August 12, 1994 to add several counts not previously included. This Court, per Judge Billings, granted the motion in part and denied it in part. However, Plaintiffs have failed to submit an Amended Complaint reflecting Judge Billings' ruling. For the purposes of the motions currently before the Court, the Court refers to the relevant counts of the proposed Amended Complaint submitted by Plaintiffs with its August 12, 1994 motion, but instructs Plaintiffs that they must submit an Amended Complaint, consistent with Judge Billings' Order of September 7, 1994, to be docketed by the Court.

veloped in the 1950s, it became one of the major ski areas in Vermont by the late 1970s. Sugarbush consists of two lift and trail facilities: "Sugarbush South" (Lincoln and Nancy Hanks peaks), and a subsequently acquired area at Mt. Ellen, formerly known as Glen Ellen, now known as "Sugarbush North." A third skiing facility in the area, Mad River Glen, has been owned and operated independently for all relevant time periods.

Much of Sugarbush South, as well as the land under an area sports facility, the Sugarbush Sports Center ("Sports Center"), is owned by the United States Government and administered by the U.S. Forest Service. The Forest Service permits ski operations on the land by the owners of the Sugarbush ski area pursuant to a special use permit.

Until the 1970s, overnight accommodations for visitors to the Sugarbush ski area were limited to local inns, lodges, hotels, motels, and bed and breakfasts in the area. During the 1970s, however, developers began constructing condominium complexes, townhouses, and time-share units. By the mid–1980s, over 1000 condominiums and/or time-share units were available in the area.

From the early 1970s until the mid–1980s, the owner of the Sugarbush ski area owned and operated a lodging reservation service, known as the "lodging bureau," which assisted potential visitors to the Sugarbush area in finding and making reservations for accommodations in the Sugarbush Valley. The lodging bureau charged local lodging providers a commission to be listed with the bureau, and any interested lodging provider was able to contract with the lodging bureau for its representation and marketing services.

In the late–1970s, following the boom in condominium construction in the Sugarbush Valley, Plaintiffs Ronald Zschaler and Miron Malboeuf established a business to market and sell short-term condominium lodging accommodations. Through an entity named Sugarbush Valley Real Estate, Inc., ("SVRE") Plaintiffs contracted with individual condominium unit owners in the Sugarbush Valley to serve as a rental agent for them. Taking a percentage of the total rental price as commission, SVRE would market and rent the units during times when the owners did not use them for their own personal use. It did so through its own direct marketing efforts as well as through the lodging bureau. At least one condominium development in the area, The Bridges, managed the rental of its own units.

Zschaler and Malboeuf expanded their business enterprise when they purchased Castlerock Management Company ("Castlerock"), a property management company which at the time of purchase held management contracts with several condominium developments in Sugarbush Valley. Upon acquisition of the company by Zschaler and Malboeuf, Castlerock obtained contracts with additional condominium properties. It provided each development with routine property maintenance, such as landscaping and snow removal, and management services, such as bookkeeping.

Zschaler and Malboeuf established two additional related businesses. First, they established Sugarbush Village Transit, Inc.,("SVT"), which owns and operates a shuttle bus service between condominium units included in SVRE's rental agency programs, and ski facilities in Sugarbush Valley. Second, they set up Sugarbush Condominiums & Properties, Inc. ("SC & P") to own commercial condominiums.

In 1986, the Sugarbush ski area was acquired by a joint venture/partnership including Defendant Snowridge, Inc., a Vermont corporation and a subsidiary of Defendant Claneil Enterprises, Inc. ("Claneil"). The partnership subsequently sought to enter the property management and short-term rental business in Sugarbush Valley, and in the late summer of 1986, it entered into negotiations with Plaintiffs Zschaler and Malboeuf for the purchase of SVRE, Castlerock, SC & P, and SVT. These negotiations ultimately failed.

In 1987, Claneil established Defendant Sugarbush Resort Corporation ("SRC"), a Vermont corporation which acquired all of the Sugarbush ski area assets from the partnership that previously held them. SRC then established its own property management and short-term rental agency company in the

form of the Sugarbush Resort Property Group ("SRPG").

While under Claneil's control, the lodging bureau was renamed "Central Reservations," and a new toll-free information number, 1–800–53–SUGAR, was established. SRPG marketed its ski and lodging packages through its own toll-free number, as well as through participation in Central Reservations.

In 1988, SRPG entered into an agreement with the Sports Center, also owned by a Claneil affiliated company, under which SRPG would include in its ski vacation packages guest access and usage of basic facilities at the Sports Center at no extra charge, and discounts on the use of additional facilities. In addition, SRPG offered fourteen days of complimentary access to the basic facilities, and additional Sports Center discounts, to homeowners who signed up with SRPG's short-term rental program and to homeowners whose associations contracted with SRPG's property management service. SVRE had sought a similar access and discount agreement with the Sports Center for its short-term rental and property management customers, but the Sports Center refused to extend such a deal to it.

Also in 1988, Plaintiffs Zschaler and Malboeuf established Ski Travel Unlimited ("STU"), a tour operator which creates and markets its own vacation packages. Sugarbush affords greater discounts on lift tickets to wholesale tour operators than to other group business purchasers. Sugarbush refused to recognize STU as a wholesale tour operator. In 1991, Plaintiffs divested STU and sold it to its previous manager, David Deutl. When Deutl reapplied for wholesale tour operator status, Sugarbush granted it.

In May 1990, Defendant Claneil or a Claneil-affiliated company acquired the Sugarbush Inn, the Sugarbush Golf Course, and the Pavilion Sports Center. Subsequently, the Sugarbush Inn's reservation system and SRPG's system were consolidated, and by 1992, the two systems were merged into the 1–800–53–SUGAR number.

A caller to Central Reservations would hear an automated message and the user of a touch-tone telephone could choose from a menu of items for further information. The items listed on the menu included information on properties managed by SRPG, on the Sugarbush Inn, and on other managed properties in the area, including those of Plaintiffs.

As part of its promotional efforts, SRC published brochures for the 1992–93 and 1993–94 seasons, advertising the Sugarbush ski area. Included in these brochures were references to properties owned and managed by SRC as "Sugarbush Resort properties," while other properties, including those managed by Plaintiffs, were labeled "area lodging." These descriptions were discontinued in materials prepared for the 1994–95 season.

In the summer of 1990, Steven Fowler, who had run SRPG from its inception, left the company and, along with another former SRPG employee, agreed to purchase the assets of Plaintiffs SVRE, Castlerock, and SVT from Zschaler and Malboeuf. Fowler established Resort Recreation Services, Inc. ("RRS"), which bought the assets of Zschaler and Malboeuf's companies. Closing occurred in November 1990. RRS owned and operated Plaintiffs' former short-term rental business under the name Sugarbush Village Condominiums ("SVC").

RRS/SVC owned and operated the rental and management businesses until June 1992, when RRS declared bankruptcy. At the time, Zschaler and Malboeuf were creditors of RRS, arising out of the 1990 sale of assets, and under the Bankruptcy Court order in the case they received all of RRS's rights and assets. Zschaler and Malboeuf subsequently created, and were the sole shareholders of, Sugarbush Village Association, Inc. ("SVA"), a non-profit corporation, which acquired the relevant assets and businesses of RRS. Through SVA, Zschaler and Malboeuf resumed ownership and operation of their former property management and short-term rental businesses. SVA continues to operate these enterprises today.

On October 15, 1994, SRC leased its ski facilities and operations to Sugarbush Resort Holdings ("SRH"), an entity unaffiliated with either Plaintiffs or Defendants. On or about May 17, 1995, SRH acquired outright sub-

stantially all of the assets, facilities and operations of SRC. These included all trademark and service mark registrations for "Sugarbush." In transferring these assets, SRC did not warrant or represent the incontestability of the trademarks and service mark registrations, and did not agree to defend or indemnify SRH with respect to Plaintiffs' claims seeking to invalidate the service marks and trademarks.

## II. Discussion

### A. Summary Judgment Standard

Summary judgment is appropriate when the Court finds that there is no genuine issue as to any material fact, and that the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The party opposing summary judgment may not rest on its pleadings but must present "significant probative evidence" demonstrating that a genuine dispute of material fact exists, and that the moving party is not entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The Court must view these materials in the light most favorable to the nonmovant, drawing all reasonable inferences in the nonmovant's favor. *Id.* at 255, 106 S.Ct. at 2513.

The moving party bears the initial burden of informing the court of the basis for the motion and of identifying those parts of the record which demonstrate absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552–53. Once the moving party has met its burden, the nonmovant may not rely on conclusory allegations or mere conjecture, but rather must offer specific facts to support a verdict in its favor. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986) (construing Fed.R.Civ.P. 56(e)). As to any claim, or essential element thereof, for which the nonmoving party bears the burden of proof at trial, the nonmoving party must make a showing sufficient to establish the existence of that claim or element.

### B. Lanham Act Claim (Count III)

Plaintiffs' Lanham Act claim relates to the advertising brochure published and distributed by Defendants in the 1993/94 season, and the automated telephone message used by Defendants on. its 1–800–53–SUGAR service in the 1992/93 and 1993/94 seasons. The brochure includes two maps indicating the locations of various accommodations in Sugarbush Valley. The first map, labeled "Sugarbush Resort properties," contains a series of triangles indicating lodging properties of Sugarbush Corporation. A second map, entitled "area lodging locator map," uses triangles and other symbols to represent properties other than those owned and managed by Sugarbush Corporation. Plaintiffs allege that the maps are misleading, in violation of the Lanham Act, because several of the triangles on the first locator map represent properties that include units owned or managed by Plaintiffs as well as by Defendants. Plaintiffs allege that the automated telephone message, which required callers to choose between "resort" complexes and "area" complexes, was misleading because the terminology suggested that "resort" complexes were closer to the ski facilities, when in fact some of the "area" complexes are closer than some of the "resort" accommodations.

Section 43(a) of the Lanham Act, as amended, provides in relevant part:

(1) Any person who, on or in connection with any goods or services ... use in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false of misleading description of fact, or false or misleading representation of fact which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person ...

\*    \*    \*    \*    \*    \*

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a). Before reaching the merits of Plaintiffs' claim under the Lanham Act, however, it is necessary to first consider the standing requirements under the Act.

### 1. Plaintiffs' Showing of Injury and Causation

██ Defendants argue that Plaintiffs lack standing to sue under the Lanham Act because none of them were in competition with Defendants in the property rental and management businesses in the 1992/93 or 1993/94 seasons, the time periods in which the alleged misrepresentations were made. Rather, the businesses were wholly owned and operated by SVA during this time, and SVA is not a party to the present action. As such, Defendants argue, Plaintiffs are unable to demonstrate any injury that they suffered as a result of Defendants' conduct.

The Second Circuit has articulated the standing requirements for a Lanham Act claim in *Ortho Pharmaceutical Corp. v. Cosprophar, Inc.,* 32 F.3d 690 (2d Cir.1994). The court stated:

> In order to establish standing to sue under [the Lanham Act], a plaintiff must demonstrate a "reasonable interest to be protected" against the advertiser's false or misleading claims ... and a "reasonable basis" for believing that this interest is likely to be damaged by the false or misleading advertising ... The "reasonable basis" prong embodies a requirement that the plaintiff show both likely injury and a causal nexus to the false advertising.

32 F.3d at 694 (citations omitted); *see also PDK Labs. Inc., v. Friedlander,* 103 F.3d 1105, 1111 (2d Cir.1997). Protectible interests have been held to include present or contemplated commercial interests, as well as "direct pecuniary interest[s]." *Friedlander,* 103 F.3d at 1111 (citing *Berni v. International Gourmet Restaurants of America, Inc.,* 838 F.2d 642 (2d Cir.1988)).

██ A Lanham Act plaintiff must demonstrate *likely* injury and causation, and need not show definite losses in sales resulting from the defendant's advertisements. *Ortho,* 32 F.3d at 694. However, " '[t]he likelihood of injury and causation will not be presumed, but must be demonstrated in

some manner.' " *Id.* (quoting *Coca–Cola Co. v. Tropicana Prods., Inc.,* 690 F.2d 312, 316 (2d Cir.1982)). Moreover, the plaintiff must make "a more substantial showing" of the degree of likelihood of injury and causation "where the plaintiff's products are not obviously in competition with the defendant's products, or the defendant's advertisements do not draw direct comparisons between the two." *Ortho,* 32 F.3d at 694; *see also Friedlander,* 103 F.3d at 1111.

It is clear that the corporate Plaintiffs in this case lack standing, as none of them were involved in property rental or management during the relevant time periods. The dispute over standing relates to the individual Plaintiffs.

The individual Plaintiffs—Zschaler, Malboeuf, Stanley, and Weir—have protectible, pecuniary interests. They were, for all relevant time periods, owners of condominium units among "area lodging" properties, and held those properties for the purpose of rental income. As participants in the rental market, the individual Plaintiffs were in competition with Defendants in the condominium rental business.

In addition to demonstrating the existence of a protectible interest, the individual Plaintiffs must show likely injury and causal nexus to Defendants' alleged false advertising. It bears repeating that Plaintiffs need not show a definite, sum-certain loss as a result of Defendants' advertising, but instead must merely demonstrate a likelihood of injury and causation. However, Plaintiffs' proof requirements on injury and causation are more substantial in this case, where the advertisement in question is non-comparative, than they would be in the case of a direct comparison advertisement. *Ortho,* 32 F.3d at 694.

The individual Plaintiffs claim that they have suffered losses in rental income due to Defendants' alleged false advertising. This claim is supported, at least with respect to Plaintiffs Zschaler and Malboeuf, by statements of Lewis Koppel, a financial expert, in response to Defendants' interrogatories, as to the extent of Zschaler and Malboeuf's losses. However, Plaintiffs have failed to demonstrate a causal link between their al-

leged losses and Defendants' advertising. Mr. Koppel's statements do not address the causation issue, and Plaintiffs have not adduced any other showing of causation, such as market studies, or customer surveys indicating the likelihood of confusion resulting from Defendants' advertisements, as required by *Ortho*. There is therefore no proffered evidence suggesting that Plaintiffs' losses were;any more likely due to Defendants' advertisements than to Defendants' mere participation in the property rental business.

Plaintiffs have suggested that *Ortho* is not controlling in this case because the products involved in *Ortho* were not in direct competition with one another, whereas the products at issue in this case—rental services—are in head-to-head competition. While it is true that the district court had found, and the Court of Appeals did not dispute, that the products in *Ortho* were not in direct competition, the Second Circuit's discussion of Lanham Act standing requirements addresses a broader range of factual circumstances.

Of particular note is the *Ortho* court's reliance on *Coca–Cola Co. v. Tropicana Prods., Inc.*, 690 F.2d 312, 316 (2d Cir.1982). In *Coca–Cola*, the plaintiff, maker of Minute Maid orange juice, challenged an advertisement of Defendant asserting the freshness of Tropicana orange juice. Thus, as in the present case, *Coca–Cola* involved products in direct competition with one another, and a non-comparative advertisement for one of the two products. As stated by the court on these facts, and quoted with approval by the *Ortho* court, "[t]he likelihood of injury and causation will not be presumed, but must be demonstrated in some manner." *Coca–Cola*, 690 F.2d at 316 (citation omitted); *Ortho*, 32 F.3d at 694. In *Coca–Cola*, injury and causation were sufficiently demonstrated by consumer evidence indicating the misleading nature of the advertisement in question.

Injury and causation were discussed in *Coca–Cola* in the context of the requirements for showing the likelihood of irreparable harm in order to obtain injunctive relief, but the Second Circuit has made clear that the *Coca–Cola* court's requirement that injury and causation be affirmatively demonstrated applies with equal force to Lanham Act standing. In *McNeilab, Inc. v. American Home Prods. Corp.*, 848 F.2d 34 (2d Cir. 1988), the court explained:

> Both *Coca–Cola* and *Johnson & Johnson* [*v. Carter–Wallace, Inc.*, 631 F.2d 186 (2d Cir.1980) ] involved misleading, non-comparative commercials which touted the benefits of the product advertised but made no direct reference to any competitor's product. The injury in such cases accrues equally to all competitors; none is more likely to suffer from the offending broadcasts than any other. The Lanham Act, however, only authorizes actions by one "who believes that he is or is likely to be damaged." 15 U.S.C. § 1125(a). Thus, we required some indication of actual injury and causation to satisfy Lanham Act standing requirements and to ensure a plaintiff's injury was not speculative.

848 F.2d at 38. Similarly, absent some affirmative showing of injury and causation, Plaintiffs' injury is merely speculative.

Plaintiffs attempt to turn *McNeilab* to their advantage by noting that the court upheld a district court's presumption of injury and causation in an action involving direct competition between the parties. However, the holding in *McNeilab* was not based on the fact that the plaintiff and defendant's products were in direct competition, but instead on the fact that the defendant's advertisement made a specific, false comparison to the plaintiff's competing product. Thus, the court held, in cases of false, comparative, advertising, a presumption of harm may be properly made. Consequently, *McNeilab* is of no avail to Plaintiffs because the advertisements in question in the present case were non-comparative.

Finally, it may be noted that in cases of literally or explicitly false advertisements, "the court may grant relief without reference to the advertisement's impact on the buying public." *Coca–Cola*, 690 F.2d at 317. Having reviewed the pamphlet challenged by Plaintiffs, and accepting as true Plaintiffs' representations as to the content of the recorded telephone message at issue, the Court finds that neither advertisement was literally

or explicitly false. Thus, some showing of causation is required.

### 2. Plaintiffs as Shareholders of SVA

■ Zschaler and Malboeuf have argued that they have standing by virtue of the fact that they are the sole shareholders of SVA. In making this argument, they rely exclusively on *Thorn v. Reliance Van Co.,* 736 F.2d 929 (3d Cir.1984). The plaintiff in *Thorn* was a forty-five percent shareholder of a trucking company that had gone bankrupt, who brought an action under § 43(a) of the Lanham Act against one of the bankrupt company's competitors. Under a "plain meaning interpretation" of § 43(a), the Third Circuit Court of Appeals held that the plaintiff, "in his capacity as an investor," had made sufficient allegations of direct injury resulting from the defendant's false advertising to gain standing under the Lanham Act. 736 F.2d at 933.

*Thorn* must be distinguished from the present case on two grounds. First, as the court in *Thorn* itself notes, the Second Circuit hews to a more restrictive reading of § 43(a) than that embraced by the Third Circuit in *Thorn. See* 736 F.2d at 932 n. 5. Second, *Thorn* must be distinguished on its facts. The plaintiff in *Thorn* sought standing "as an investor in a bankrupt corporation." 736 F.2d at 933. Moreover, the corporation was "controlled by individuals who allegedly conspired to injure that corporation through false advertising." *Id.* In contrast, SVA is a solvent corporation controlled, by their own admission, by Zschaler and Malboeuf. In *Thorn,* the interests of the bankrupt corporation would be protected, if at all, by the plaintiff alone. In the present case, however, SVA is fully capable of protecting its own interests, and Zschaler and Malboeuf, despite their ownership interests, lack the standing to do so.

In summary, in order to establish standing, Plaintiffs must show injury and causation as required by *Ortho.* Because Plaintiffs have failed to make such showing, they lack standing with respect to their § 43(a) claim. Defendants' Motion for Summary Judgment on Count III is therefore granted, and Plaintiffs' respective motion is denied.

In addition to its motion regarding Count III, Defendants have moved for summary judgment on all of Plaintiffs' remaining claims. Each claim is addressed in turn.

### A. Equal Access to U.S. Forests (Count VII)

■ All of the Sugarbush ski area and much of the Sports Center are situated on land owned by the United States Government and administered by the U.S. Forest Service. Defendant Snowridge holds a permit to these lands pursuant to 16 U.S.C. §§ 497 and 497b. Section 497 of Title 16 provides that the Secretary of Agriculture's authority to issue use permits such as that held by Defendant Snowridge must not "preclude the general public from full enjoyment of the natural, scenic, recreational, and other aspects of the national forests." Pursuant to § 497b, Snowridge's use permit is subject to certain "terms and conditions." Plaintiffs allege that Defendants' pricing and marketing schemes violated Title 16, terms and conditions of Defendants' special use permits, Department of Agriculture Regulations, and Forest Service policies and rules.

Even assuming, *arguendo,* that Plaintiffs' claims are true, Defendants will prevail on their summary judgment motion because §§ 497 and 497b do not provide a private right of action. To determine whether a private right of action exists, the Court must examine the text and history of the statute to determine Congress' intent. *Touche Ross & Co. v. Redington,* 442 U.S. 560, 575–76, 99 S.Ct. 2479, 2489, 61 L.Ed.2d 82 (1979). Neither the language of § 497 nor that of § 497b grants any form of private right. Furthermore, the legislative history of the statutes is devoid of any indication that Congress intended to create a private remedy for violation of the statutes. *See* 1956 U.S.C.C.A.N. (70 Stat. 708) 3634; Pub.L. No. 99–522. Thus the Court concludes that Congress neither expressly nor impliedly created a private right of action.

Because no private right of action exists, Plaintiffs have failed to state a claim for which relief can be granted. Thus, pursuant to Fed.R.Civ.P. 12(b)(6), Defendants are enti-

tled to judgment as a matter of law, and Defendants' motion for summary judgment with respect to Count VII is granted.

### B. Trademark Registration (Count VI)

■ In Count VI, Plaintiffs seek to invalidate several service marks for the term "Sugarbush" that Plaintiffs allege Defendants obtained fraudulently from the United States Patent and Trademark Office. Plaintiffs claim that Defendants made false representations in its applications to the Patent Office by stating that the term "Sugarbush" did not refer to a geographic location rather than strictly to the ski area. Plaintiffs also allege that "Sugarbush" is inherently unregisterable because it is primarily a geographic descriptive term. Regardless of the merits of these claims, however, Plaintiffs cannot succeed on them in this case because Defendants no longer hold the service marks in question.

Defendants transferred their right, title, and interest in the "Sugarbush" registrations to SRH in May 1995, when SRH purchased the entire ski resort. The Acquisition Agreement between Defendants and SRH explicitly states that Defendants "make no representation or warranty" as to the validity of the service marks, and that they decline to defend or indemnify SRH against any claims of the service marks' invalidity. The transfer to SRH therefore extinguished all of Defendants' interest in or obligation for the service marks, leaving SRH as the sole holder of the service mark title and interest.

Because of the exclusive proprietary nature of SRH's interest in the relevant service marks, complete relief cannot be granted on Count VI in SRH's absence. Moreover, adjudication of the trademark claim would clearly impair SRH's ability to protect its interests. Thus, SRH is a necessary party under Fed.R.Civ.P. 19. Defendants are entitled to judgment as a matter of law due to Plaintiffs' failure to join a necessary party, and therefore Defendants' motion for summary judgment on Count VI is granted.

### C. Antitrust Claims: Standing

Plaintiffs allege a cluster of antitrust claims based on violations of § 2 of the Sherman Act and § 3 of the Clayton Act.

■ Section 4 of the Clayton Act, 15 U.S.C. § 14, authorizes private actions for recovery due to violation of the antitrust laws. Section 4 provides, in pertinent part, that "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States ... and shall recover threefold the damages by him sustained...." Despite the broad sweep of this language, a private plaintiff may not recover damages merely by showing " 'injury causally linked to an illegal presence in the market' "; rather, "a plaintiff must prove the existence of 'antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.' " *Atlantic Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 334, 110 S.Ct. 1884, 1889, 109 L.Ed.2d 333 (1990) (quoting *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977)(emphasis in original)). Thus, injury causally related to an antitrust violation is not actionable under § 4 "unless it is attributable to an anti-competitive aspect of the practice under scrutiny." *Id.*

In addition to this "antitrust injury" requirement, the Supreme Court has articulated several "other reasons" that might affect whether a private plaintiff has standing under § 4. These include: (1) a "causal connection between an antitrust violation and harm" to the plaintiff; (2) existence of an improper motive; (3) whether the injury was of a type that Congress sought to redress by creating a private remedy for violation of the antitrust laws; (4) the "directness or indirectness of the asserted injury" as it relates to the alleged restraint in the relevant market; (5) the "existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement"; (6) the speculative nature of the damages; and (7) the "risk of duplicate recoveries ... or complex apportionment of damages." *Associated Gen. Contractors of Cal., Inc. v. California State Council of Carpenters,* 459 U.S. 519, 537–44, 103 S.Ct. 897, 908–12, 74 L.Ed.2d 723 (1983);

*see also Balaklaw v. Lovell,* 14 F.3d 793, 797 n. 9 (2d Cir.1994). Thus, whether a plaintiff has-antitrust standing depends on a two-part inquiry: first, whether the plaintiff suffered an antitrust injury; and second, "whether any of the other factors, largely relating to directness and identifiability of the plaintiff's injury, prevent the plaintiff from being an efficient enforcer of the antitrust laws." *Balaklaw,* 14 F.3d at 797 n. 9.

■ Plaintiffs have pled an antitrust injury, thus meeting the primary requirement for antitrust standing. Plaintiffs claim that their economic interests have been severely impaired as a result of Defendants' allegedly unfair practices, including: Defendants' refusal to extend discounted access rates to the Sports Center; Defendants' practice of offering Sports Center access to individuals and homeowner associations which entered into management and maintenance agreements with Defendants; Defendants' practice of offering greater discounts on lift tickets to individuals and homeowners contracting with Defendants; and Defendants' practice of diverting and steering callers to the 1–800–53–SUGAR number to Defendants' properties. Assuming that these allegations are true, and that some or all of Defendants' actions constituted antitrust violations, the harm alleged by Plaintiffs is "the type of loss that the claimed violations... would be likely to cause," *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 125, 89 S.Ct. 1562, 1577, 23 L.Ed.2d 129 (1969), and is therefore an antitrust injury.

■ Defendants argue that Plaintiffs lack standing in light of the factors outlined in *Associated General.* First, Defendants contend that Plaintiffs Zschaler and Malboeuf sue only as employees, officers, and shareholders of corporate Plaintiffs SVRE, CRM, SVT, and STU, and therefore their injuries are derivative, speculative, remote, and indirect. Zschaler and Malboeuf counter that they have standing by virtue of the fact that they are sole shareholders of SVA, despite the fact that SVA is not a party to the suit. Zschaler and Malboeuf's shareholder status is not sufficient to establish standing, for

regardless of the percentage of shares they hold, their interest is derivative of SVA's. As discussed above, Plaintiffs' reliance on *Thorn* is unconvincing in light of the specific factual circumstances of that case.

■ Plaintiffs also contend that Zschaler and Malboeuf, as well as Plaintiffs Stanley and Weir, have standing by virtue of the fact that they are owners of condominium units in the same rental market as Defendants' businesses, and have lost rental income. To this Defendants argue that Plaintiffs have failed to show a causal connection between Defendants' antitrust violations and Plaintiffs' harm. Although causation is one of the *Associated General* factors, it is a less stringent requirement than the causation element of Lanham Act standing. Here, as in *Associated General,* Plaintiffs' complaint alleges a causal connection between their harm and Defendants' alleged antitrust violations. Moreover, the causal chain alleged is sufficiently direct to establish Plaintiffs' standing.

■ Next, Defendants contend that Plaintiff SVT, the shuttle bus operator, lacks antitrust standing because its profits and losses are wholly derivative of SVRE's. Defendants' contention is essentially correct. SVT's revenue is calculated as a percentage of SVRE's revenue, and as such any losses suffered by SVT are strictly a function of SVRE's decrease in revenue. Any recovery of losses by SVT would be entirely duplicative of SVRE's losses. SVT therefore lacks standing, and is dismissed from the suit.

■ The remaining corporate Plaintiffs—SVRE, SC & P, Castlerock, and STU—have all shown sufficient injury and causation to warrant standing under *Associated General.* However, Plaintiffs SVRE and Castlerock only have standing for conduct occurring before November 1990, the date when Plaintiffs sold SVRE and Castlerock to Steve Fowler and RRS. Between November 1990 and June 17, 1992, when the Bankruptcy Court returned to Plaintiffs the businesses sold to RRS, Plaintiffs held no interest whatsoever in SVRE or Castlerock. As such, they lack standing to sue for injuries suffered during this time period.[2]

---

**2.** At oral argument, Plaintiffs suggested that the

Bankruptcy Court's order granting to Plaintiffs

D. *Attempted Monopolization and Monopolization*

In Counts I and II of the proposed Amended Complaint, Plaintiffs allege that Defendants have attempted to monopolize, and have in fact monopolized, the markets for rental and property management services in the Sugarbush area, in violation of § 2 of the Sherman Act, 15 U.S.C. § 2.[3] Section 2 prohibits monopolization and the attempt to monopolize interstate trade or commerce by a private firm. In order to prove attempted monopolization, a plaintiff must show: "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456, 113 S.Ct. 884, 890–91, 122 L.Ed.2d 247 (1993). To prove actual monopolization, a plaintiff must establish: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966); *see also Delaware & Hudson Ry. Co. v. Consolidated Rail Corp.*, 902 F.2d 174, 178 (2d Cir.1990), *cert. denied*, 500 U.S. 928, 111 S.Ct. 2041, 114 L.Ed.2d 125 (1991).

A necessary element to both attempted and actual monopolization is monopoly power. Monopoly power is "the power to control prices or exclude competition." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391, 76 S.Ct. 994, 1005, 100 L.Ed. 1264 (1956). In order to determine whether monopoly power exists, the Court must first consider the relevant geographic and product or service markets. Indeed, proof of the relevant markets is a necessary element of attempted and actual monopolization for which Plaintiffs bear the burden of proof. *Nifty Foods Corp. v. Great Atlantic & Pac. Tea Co.*, 614 F.2d 832, 840 (2d Cir.1980).

■ A relevant market consists of "products [or services] that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered." *du Pont*, 351 U.S. at 404, 76 S.Ct. at 1012. In determining the relevant market, the Court must also consider the cross-elasticity of demand and supply. *Id.* at 400, 76 S.Ct. at 1010; *AD/SAT v. Associated Press*, 920 F.Supp. 1287 (S.D.N.Y.1996). Cross-elasticity of demand is "the responsiveness of the sales of one product to price changes of the other." *du Pont*, 351 U.S. at 400, 76 S.Ct. at 1010. Cross-elasticity of supply refers to "the extent to which producers will be willing to shift their resources from supplying a product or service in one market to supplying a product or service in a different market in response to price changes in the second market." *AD/SAT*, 920 F.Supp. at 1297.

the assets sold to RRS in 1990 "put Mr. Zschaler and Mr. Malboeuf and their companies in position as of the day they sold to RRS." Plaintiffs argued further that the Bankruptcy Court's decision was "a nunc pro tunc order where they went basically back to the time of the sale." Plaintiffs mischaracterize the order and misapply the doctrine of nunc pro tunc. The order clearly states that it is "nunc pro tunc to June 17, 1992," the date of a telephonic hearing held by the Bankruptcy Court, at which an order was tendered but inadvertently not docketed. This is in keeping with the purpose of nunc pro tunc orders, namely to " 'record an order actually made, which, through some oversight or inadvertence, was never entered on the records of the court, or which was incorrectly entered.' " *In re Ravenna Industries, Inc.*, 20 B.R. 886, 890 (Bankr. N.D.Ohio 1982) (quoting 56 Am.Jur.2d, Motions, Rules and Orders Section 44 (1971)). It is therefore clear that the Bankruptcy Court never intended for Plaintiffs' rights and liabilities in the assets to relate "back to the time of the sale" in November 1990.

**3.** The proposed Amended Complaint also refers to attempted and actual monopolization of the lodging reservations, lodging accommodations, and food service trades in the Sugarbush area. These issues have gone unaddressed in subsequent briefs, and the Court deems them to have been abandoned. Moreover, the Court notes that even if Plaintiffs intended to prosecute the food services claim, the corporate Plaintiffs lack standing to do so, for the "bad acts" of which they complain—namely, a "Sugarbush Club Card" provided to SRPG customers affording them discounts at restaurants owned by Defendants—was not instituted until mid–1991, after Plaintiffs had sold their relevant business interests to Fowler/RRS.

It is axiomatic that the larger the area defined as the relevant market, the more difficult it is for Plaintiffs to establish Defendants' market power. It is therefore not surprising that Defendants seek to define the relevant market as the entire Northeastern ski area, comprised of New England and eastern Canada. Also unsurprising is Plaintiffs' contention that the relevant market is limited to the immediate Sugarbush area. By Defendants' account, its rental and property management businesses are interchangeable with similar businesses throughout the Northeast. Consumers, Defendants argue, choose which of the many ski resorts in the Northeast to visit based on services such as the lodging facilities in which they will stay. In contrast, Plaintiffs argue that most customers first decide to ski at Sugarbush, and then decide on what facilities they desire. *See* Perdue Dep. at 31 (Paper No. 117 Exh. 8). Viewing the evidence in the light most favorable to Plaintiffs, the Court finds that Plaintiffs have demonstrated a genuine factual dispute as to the relevant market, and therefore survive summary judgment on this issue.[4]

Assuming, for the purposes of the pending motion, that the relevant market is limited to the Sugarbush area, the Court next Considers Defendants' market power. Market share is the primary, though not the sole, indicator of market power. *See Delaware & Hudson Ry.*, 902 F.2d at 179; *Twin Laboratories, Inc. v. Weider Health & Fitness*, 900 F.2d 566, 570 (2d Cir.1990). "The trend of guidance from the Supreme Court and the practice of most courts endeavoring to follow that guidance has been to give only weight and not conclusiveness to market share evidence." *Broadway Delivery Corp. v. United Parcel Serv. of America, Inc.*, 651 F.2d 122, 128 (2d Cir.), *cert. denied*, 454 U.S. 968, 102 S.Ct. 512, 70 L.Ed.2d 384 (1981). Thus, although the majority of cases in which courts have found monopoly power to exist involved market shares of over 50%, *see, e.g., Dela-*

*ware & Hudson Ry.*, 902 F.2d at 179 (two-thirds market share precludes summary judgment in favor of defendant), there is no magic number that irrebuttably establishes monopoly power. Rather, several additional factors should be considered, such as the strength of the competition' "the probable development of the industry, barriers to entry, the nature of the anticompetitive conduct and the elasticity of consumer demand." *Walsh Trucking*, 812 F.2d at 790.

Plaintiffs concede that Defendants have only 35% of the rental market business in the Sugarbush area, and only 30% of the property management market. However, they argue that monopoly power, or the dangerous probability of monopoly power, can be inferred from Defendants' control of Central Reservations, and its alleged steering of callers to its own rental units. In support of its claim that Defendants steered callers, Plaintiffs rely on statements by Defendants' President Robert Berry, and marketing manager Scott Clarkson, that Defendants sought to book Central Reservations callers in its own units before those of competitors, as well as representations to customers that they would benefit from the fact that Defendants' own the 1–800 system. *See* Berry Dep. at 24–25 (Paper No. 117 Exh. 6); Clarkson Dep. at 143 (Paper No. 130 Exh. G); Patterson Letter at 1 (Paper No. 117 Exh. 9).

In light of this evidence, Plaintiffs have shown a genuine factual dispute to exist as to the steering of Central Reservations callers. This notwithstanding, Plaintiffs have failed to demonstrate that Defendants are presently capable of controlling prices to exclude competition in the Sugarbush area, for the fact remains that Plaintiffs possess a majority market share. Plaintiffs' claim of actual monopolization must therefore be dismissed. However, Defendants' market share, when combined with their control of Central Reservations and alleged customer steering, does demonstrate a factual dispute as to the exis-

---

**4.** Plaintiffs' argument is particularly strong with respect to property management services. Indeed, it is highly unlikely that a condominium owner in the Sugarbush Valley would turn to the property management services of a company in Quebec if SRPG's rates were to increase. It is similarly unlikely that a Quebec company would begin providing property management services in the Sugarbush area in response to a price increase by Defendants. Put another way, there appears to be a cross-inelasticity of supply and demand in the property management business.

tence of a dangerous possibility that Defendants would achieve monopoly control.

Having established a factual dispute as to the dangerous probability of monopoly power, Plaintiffs must also show, in order to succeed on a claim of attempted monopolization, that Defendants have engaged in predatory or anticompetitive conduct with a specific intent to monopolize. Defendants' alleged predatory or anticompetitive conduct is discussed below. With respect to the intent to monopolize, despite Defendants' claims to the contrary, Plaintiffs have demonstrated a factual dispute on this issue. Specifically, they have pointed to Defendants' stated intent to capture 66% of the short-term rental market by 1997, *see* Weber Dep. (Paper No. 117 Exh. 1); Five Year Master Plan (Paper No. 117 Exh. 2); deposition testimony of Defendants' President Berry in which he states Defendants' intent to capture 100% of every dollar spent by visitors to the Sugarbush area, *see* Berry Dep. at 24–25 (Paper No. 117 Exh. 6); and Defendants' statement that they intended to place callers to Central Reservations in their own rental units first, whenever possible, before renting the units of others. *Id.* at 21–22; Clarkson Dep. at 143 (Paper No. 130 Exh. G).

Defendants dispute the accuracy of some of these statements. For example, they argue that the 66% target market share was based on an assumption that 1000 new units be built in the area. Such arguments, however, merely point to the existence of genuine factual disputes as to Defendants' intent to monopolize.

### E. Plaintiffs' Antitrust Theories

#### 1. Tying Claim

Plaintiffs claim that Defendants' exclusive agreement with the Sports Center, according to which use of the Sports Center was offered in conjunction with SRPG's lodging packages, constitutes an illegal tying arrangement.[5]

A tying arrangement is "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product." *Northern Pac. Ry. Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). The Supreme Court has stated that "the essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 12, 104 S.Ct. 1551, 1558, 80 L.Ed.2d 2 (1984). The Second Circuit has articulated five specific elements of an illegal tying: (1) a tying and a tied product; (2) evidence of "actual coercion" that forced the buyer of the tying product to accept the tied product; (3) sufficient economic power in the tying product market to achieve such coercion; (4) anticompetitive effects in the tied market; and (5) the involvement of a "not insubstantial" amount of interstate commerce in the tied market. *Gonzalez v. St. Margaret's House Hous. Dev. Fund Corp.,* 880 F.2d 1514, 1516–17 (2d Cir.1989).

Plaintiffs' claim is that Defendants have used their market power over the rental market (the tying product) facilitated by their control over Central Reservations, to force customers to purchase discounted access to the Sports Center (the tied product). As a preliminary matter, however, Plaintiffs have provided no evidence of the availability of discounted access to the Sports Center as a product separate from Defendants, lodging packages. Thus, even when taking the evi-

---

5. Tying agreements are ordinarily actionable under § 1 of the Sherman Act or § 3 of the Clayton Act. Plaintiffs have alleged a violation of § 3 of the Clayton Act in Count IV of the proposed Amended Complaint. The Clayton Act prohibits exclusive dealing contracts and tying contracts "the effect of . . . [which] may be to substantially lessen competition or tend to create a monopoly in any line of commerce." 15 U.S.C. § 14. Tying agreements may also be brought under § 2 of the Sherman Act. *See Will v. Comprehensive Accounting Corp.,* 776 F.2d 665, 669 (7th Cir.1985) (Easterbrook, J.), *cert. denied,* 475 U.S. 1129, 106 S.Ct. 1659, 90 L.Ed.2d 201 (1986). Plaintiffs have failed to plead a violation of § 1 of the Sherman Act, and therefore the Court considers Plaintiffs, tying claim under § 2 of the Sherman Act and § 3 of the Clayton Act. The analysis for the claim is identical for both statutes.

dence in the light most favorable to Plaintiffs, Plaintiffs have failed to show a factual dispute as to the existence of independent tying and tied products.

Moreover, even if two separate products existed, and even assuming that Defendants had sufficient market power in the rental market to coerce customers into accepting Sports Center access, there is no evidence whatsoever that Defendants did in fact apply coercive pressures. The Court will not infer coercion from the mere bundling of products by Defendants. As tying is the only theory on which Plaintiffs argue a violation of the Clayton Act, Defendants' motion for summary judgment as to Count IV of the proposed Amended Complaint is granted.

### 2. Essential Facility Claim

■■■ Plaintiffs claim that Defendants have complete control over two "essential facilities": Central Reservations, and the Sports Center. They claim further that Defendants have denied Plaintiffs access to these facilities, in violation of § 2 of the Sherman Act.

A facility is considered "essential" only if the " 'denial of its use inflicts a severe handicap on potential [or current] market entrants.' " *Twin Laboratories*, 900 F.2d at 568 (quoting *Hecht v. Pro–Football, Inc.*, 570 F.2d 982, 992 (D.C.Cir.1977), *cert. denied*, 436 U.S. 956, 98 S.Ct. 3069, 57 L.Ed.2d 1121 (1978)). A refusal to grant access to an essential facility violates the antitrust laws because of the danger that a monopolist in one market might use its market power to extend its monopoly into another. *See MCI Communications Corp. v. American Tel. & Tel. Co.*, 708 F.2d 1081, 1133 (7th Cir.), *cert. denied*, 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983); *Twin Laboratories*, 900 F.2d at 568. In order to succeed on an essential facility claim, a plaintiff must show: "(1) control of the essential facility by a monopolist; (2) a competitor's inability practically or reasonably to duplicate the essential facility; (3) the denial of the use of the facility to a competitor; and (4) the feasibility of providing the facility." *MCI*, 708 F.2d at 1132–33; *Delaware & Hudson Ry.*, 902 F.2d at 179 (applying *MCI* test)

Plaintiffs have made no showing whatsoever as to Defendants' monopoly control with respect to the Sports Center. Assuming that the Sports Center, The Bridges, and other sports facilities in the area were interchangeable from a consumers' perspective—and there has been no significant evidence to the contrary—then the relevant market is Sugarbush area. The Court has before it no evidence as to Defendants' share of the sports facility market in the Sugarbush area, and thus would be unable to conclude that Defendants held monopoly power.

Even if the Sports Center were shown to be an essential facility, Plaintiffs have presented no evidence suggesting their inability to obtain access to a similar facility in the area. Defendants have produced evidence suggesting that a comparable facility was available at The Bridges condominium complex, and that RRS had negotiated discounted access to the facility when it owned the property rental and management businesses now owned by Plaintiffs. Plaintiffs have failed to present "significant probative evidence" of a factual dispute on this issue, *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510, for example by showing that-Plaintiffs themselves sought a similar arrangement with The Bridges.

■■■ Plaintiffs also claim that Central Reservations is an essential facility to which they have denied equal access. Plaintiffs have presented evidence suggesting that Central Reservations is essential for a short-term condominium rental business to compete in the Sugarbush area. Specifically, Plaintiffs have shown that over 800% of lodging reservations in the Sugarbush area are made through Central Reservations. A genuine factual question therefore exists as to whether Central Reservations is in fact an essential facility.

Plaintiffs have also demonstrated genuine factual issues with regard to each of the four elements set forth in *MCI*. First, there is a factual dispute as to whether Central Reservations is controlled by a "monopolist." As with the property rental and management businesses, Plaintiffs have brought forth significant evidence suggesting that visitors to Sugarbush first choose which ski area to

visit, and then decide upon services such as lodging. There is, therefore, a factual dispute as to the relevant market. Assuming that the market is limited to the Sugarbush area, Plaintiffs have made a sufficient showing with regard to Defendants' market power—namely, that, 80% of all bookings in the area are made through Central Reservations—to withstand Defendants' motion for summary judgment.

Plaintiffs have also made a sufficient factual showing of their inability to duplicate the essential facility, thus satisfying the second *MCI* factor. Central Reservations, and its precursor the lodging bureau, have for years provided the vast majority of bookings for lodging in the Sugarbush area. It is therefore at least questionable that Plaintiffs could reasonably or practically establish an effective and competitive reservations system of its own.

With regard to the third *MCI* factor, denial of the use of the essential facility to a competitor, Plaintiffs' argument turns on the allegation that Defendants diverted Central Reservations callers to its rental units first. If this is true, then it may be argued that Plaintiffs have been effectively denied the use of Central Reservations, despite the fact that they are listed with Central Reservations and receive bookings through the reservations system.[6] In light of the fact that the Court has already found Plaintiffs to have shown a genuine factual dispute as to Defendants' alleged steering, Plaintiffs have demonstrated a factual dispute as to denial of an essential facility exists as well.

Finally there is no dispute that the provision of equal, non-discriminatory access to Central Reservations is feasible, and that any alleged denial of equal access was based on Defendants' business decisions rather than feasibility. The last *MCI* factor is thus satisfied.

In light of the foregoing discussion, the Court finds that Defendants have failed to meet their burden of demonstrating the absence of a genuine factual dispute regarding Plaintiffs' essential facility claim as it relates

to Central Reservations. Defendants' motion for summary judgment with regard to the essential facilities claim is therefore denied.

### 3. "Refusal to Deal" Claim

Closely related to Plaintiffs' essential facility theory is their claim that Defendants' failure to offer SVRE discounted access to the Sports Center constitutes a "refusal to deal," in violation of the antitrust laws. Specifically, Plaintiffs allege that prior to Defendants' purchase of the Sugarbush ski operation, access to the Sports Center was available to all lodging facilities and their guests on equal terms. Upon purchase of the ski operation and the Sports Center, SRPG and the Sports Center entered into its discounted access arrangement, and Defendants denied Plaintiffs a similar deal.

In general, a business, even a monopolist, has the right to refuse to deal with other firms. *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 601, 105 S.Ct. 2847, 2856, 86 L.Ed.2d 467 (1985). However, this is not an unqualified right, and in certain circumstances a monopolist's refusal to enter into cooperative ventures with a competitor, absent a valid business justification, may violate § 2 of the Sherman Act. *Id.* at 601, 604–05, 105 S.Ct. at 2856–57, 2858–59. In *Aspen Skiing*, four separate ski areas jointly marketed a lift ticket allowing skiers to ski at any of the four facilities. Aspen Skiing Co., the owner of one of the facilities, subsequently acquired two of the remaining ski areas, thereby achieving monopoly power, and then discontinued the "All Aspen" lift ticket in favor of a three-area ticket, thus leaving the remaining facility, Aspen Highlands, out in the cold. The Supreme Court held that the monopolist's decision to "make an important change in a pattern of distribution that had originated in a competitive market and had persisted for several years," when such decision was not supported by valid business reasons, constituted an antitrust violation. *Id.* at 603, 105 S.Ct. at 2858.

---

**6.** This argument is undermined, but not wholly eviscerated, by Defendants' contention that during the relevant time period (1987–90), SVRE

consistently received more rental reservations through Central Reservations than did SRPG.

Plaintiffs' refusal to deal claim founders for the same reason that their essential facilities claim did: Plaintiffs' have failed to adduce any evidence of the Sports Center's market share in the Sugarbush area, and therefore the Court is unable to conclude that Defendants had monopoly power. Even if some showing of monopoly control had been made, however, Plaintiffs' claim would fail because unlike the All–Aspen lift ticket at issue in *Aspen Skiing*, discounted access to the Sports Center was never previously available to SVRE or other area lodging providers. Plaintiffs argue that the unavailability of discounted access for any lodging provider prior to Defendants' acquisition of the Sports Center was an "arrangement" according to which Plaintiffs had the opportunity to offer their guests access to the Sports Center on the same terms as those offered to the guests of other lodging facilities. This argument is artful but unavailing, for despite Plaintiffs' efforts to characterize it as such, the absence of an arrangement is not itself an arrangement of the sort contemplated in *Aspen Skiing*.

### 4. Monopoly Leveraging

[20] Plaintiffs' last antitrust theory is that Defendants have used their monopoly power over Central Reservations to unlawfully gain advantage in the short-term condominium rental market. Under the theory of monopoly leveraging, "the use of monopoly power attained in one market to gain a competitive advantage in another is a violation of § 2, even if there has not been an attempt to monopolize the second market." *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 276 (2d Cir.1979), *cert. denied*, 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980); *see also Carleton v. Vermont Dairy Herd Imp. Ass'n, Inc.*, 782 F.Supp. 926, 934 (D.Vt. 1991).

The Second Circuit explained the elements necessary to a monopoly leveraging claim in *Grand Light & Supply Co. v. Honeywell, Inc.*:

A successful claim of monopoly leveraging requires proof of at least three factors: monopoly power in one market, " 'the use of [that] power, however lawfully acquired, to foreclose competition, to gain a competitive advantage, or to destroy a competitor' " in another distinct market, and injury caused by the challenged conduct.[7]

771 F.2d 672, 681 (2d Cir.1985) (quoting *Berkey Photo*, 603 F.2d at 275, and *United States v. Griffith*, 334 U.S. 100, 107, 68 S.Ct. 941, 945, 92 L.Ed. 1236 (1948)); *see also Carleton*, 782 F.Supp. at 935. Plaintiffs have made sufficient showings on each element to withstand Defendants' summary judgment motion. First, as has already been discussed, they have demonstrated a factual dispute as to Central Reservations' monopoly power among lodging reservations systems in the Sugarbush area. Second, Plaintiffs have presented evidence suggesting that Defendants were engaged in a process of steering customers to their own rental units. Such steering, if true, would clearly tend to "foreclose competition, to [give Defendants'] a competitive advantage, or to destroy a competitor.' " Finally, Plaintiffs have made an adequate showing as to their injury. Defendants' motion with regard to the monopoly leveraging claim is therefore denied.

### F. Common Law Unfair Competition (Count V)

■ Count V of the proposed Amended Complaint alleges "violation of Vermont common law unfair trade practices." Proposed Amended Complaint ¶ 142. The parties dispute whether such a common law cause of action exists in Vermont, and if so, whether its requirements have been met.

Although the caselaw is scant, a common law action for unfair competition does appear to exist. As recently as 1981, the Vermont Supreme Court acknowledged, though did

---

7. Defendants have argued the theoretical infirmities of the monopoly leveraging doctrine, and have suggested that the Second Circuit has retreated somewhat from its articulation of the doctrine in *Berkey Photo*. Specifically, they reference *Twin Labs*, 900 F.2d at 570, as dismissing some of *Berkey Photo*'s language as "dictum."

As the excerpt from *Grand Light & Supply* makes clear, however, the Second Circuit's espousal of monopoly leveraging is not limited to *Berkey Photo*. Thus, even if *Twin Labs* is read to constrain *Berkey Photo*, the doctrine of monopoly leveraging is still viable in this Circuit.

not rule upon, a claim of unfair competition, albeit in a regulatory setting. *Chesshire v. New England Tel. & Tel. Co.,* 139 Vt. 323, 428 A.2d 1106 (1981). The Vermont Supreme Court has also ruled upon the merits of an unfair competition claim in the context of trade name protection. *Vermont Motor Co. v. Monk,* 116 Vt. 309, 75 A.2d 671 (1950). Finally, the District Court recognized the cause of action in *Brattleboro Publ'g Co. v. Winmill Publ'g Corp.,* 250 F.Supp. 215 (D.Vt.), *aff'd,* 369 F.2d 565 (2d Cir.1966).

As the court stated in *Brattleboro Publishing,* "[c]ommon law unfair competition must be grounded in either deception or appropriation of the exclusive property of the plaintiff." 250 F.Supp. at 218 (citing *Société Comptoir De L'Industrie Cotonniere v. Alexander's Department Stores, Inc.,* 299 F.2d 33 (2d Cir.1962)). The Court finds that Plaintiffs have made a sufficient showing to withstand Defendants' summary judgment motion. In light of the uncertain state of this area of law in Vermont, the Court will require further briefing on the issue upon trial.

### III. Conclusion

Based on the foregoing analysis, Plaintiffs' Motion for Partial Summary Judgment on Count III (Paper No. 100) is hereby DENIED, and Defendants' Cross–Motion for Partial Summary Judgment on Count III (Paper No. 111) is GRANTED. Furthermore, Defendants' Motion for Summary Judgment on All Claims and Counts Except Count III (Paper No. 103) is GRANTED in part and DENIED in part as follows: the motion is granted as to Counts IV, VI, and VII; denied as to Count V; and granted in part and denied in part as to Counts I and II. The Court notes specifically that Plaintiff SVT is dismissed as a party to the suit.