ENZYMOTEC LTD., Plaintiff,

v.

NBTY, INC., Defendant.

No. 08–CV–2627 (ADS)(ETB).

United States District Court, E.D. New York.

Dec. 7, 2010.

Greenberg Traurig, LLP, by Robert Allen Horowitz, Esq. & Candace Marie Camarata, Esq., Of Counsel, New York, NY, Attorneys for the plaintiff.

Jaspan Schlesinger LLP, by Linda S. Agnew, Esq., Scott B. Fisher, Esq., & Christopher D. Palmieri, Esq., Of Counsel, Garden City, NY, Attorneys for the defendant.

Dorsey & Whitney LLP, by Sandra Edelman, Esq., Of Counsel, New York, NY, Attorneys for the defendant.

## MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

The Plaintiff Enzymotec Ltd. ("Enzymotec") commenced this action against Defendant NBTY, Inc. ("NBTY") alleging that it was damaged by NBTY's misconduct in breaching agreements and misleading Enzymotec as to whether NBTY intended to make Enzymotec its exclusive supplier. Enzymotec also asserted that NBTY violated 15 U.S.C. 1125(a) (the "Lanham Act") by misrepresenting the character, nature, and quality of its products.

There are three motions currently pending before the Court. The first is Enzymotec's motion to amend the complaint to add a number of factual allegations and an additional cause of action for Breach of Supply Agreement. Second, NBTY has filed a motion for partial summary judgment seeking to dismiss the Lanham Act cause of action on the ground that Enzymotec lacks standing to bring the claim. Finally, after NBTY's summary judgment motion was fully briefed, Enzymotec sought leave from the Court to file a surreply to respond to NBTY's allegations of discovery abuses by Enzymotec and its allegation that Enzymotec's opposition contained a new theory of damages. For the reasons discussed below: (1) Enzymotec's motion to amend the complaint is granted; (2) NBTY's motion for partial summary judgment is granted; and (3) Enzymotec's request to file a sur-reply is denied as moot.

## I. BACKGROUND

Unless otherwise stated and, because the Court ultimately grants Enzymotec's motion to amend the complaint, the Court draws the facts below from Enzymotec's Proposed Amended Complaint ("PAC").

### A. The Parties

The Plaintiff Enzymotec is a privately-owned company based in Israel that sells, among other things, a raw material called phosphatidylserine ("PS"). In addition to selling raw PS, Enzymotec has also sold soft-gel capsules containing PS to wholesalers, distributors and retailers. Defendant NBTY, based in Ronkonkoma, New York, is the largest manufacturer, marketer and distributor of a wide variety of nutritional supplements. One of the nutritional supplements NBTY manufactures and distributes is Neuro–PS [tm] ("Neuro–PS") and its in-store brand formulations (collectively referred to as "Neuro–PS"), which have as the principal ingredient PS–20 or PS20 (material containing 20% PS by weight). NBTY claims that Neuro–PS, among other things, helps support brain health and improves memory. NBTY manufacturers Neuro–PS using raw PS–20 that it purchases and then processes into soft-gel capsules, which are then either sold at retail or directly to consumers through NBTY subsidiaries. Enzymotec also alleges that NBTY sells soft-gel capsules containing PS–20 to wholesalers and distributors.

Over the years in which NBTY manufactured Neuro–PS, it purchased the raw PS–20 from a variety of suppliers and distributors. According to Enzymotec, it is one of four major PS suppliers, it has a 30% market share—although it is unclear how Enzymotec defines the market—and from 2005 through 2007 it was the only supplier that could provide stable PS–20. As discussed in detail below, based on its contention that it produced a superior PS–20 product to that of other suppliers, Enzymotec sought to become NBTY's exclusive PS–20 supplier. The parties dispute the facts regarding the various representations and agreements over the course of approximately two and a half years of negotiations.

### B. The Initial Negotiations

On November 19, 2005, representatives from Enzymotec and NBTY met to discuss the possibility of Enzymotec becoming one of NBTY's PS suppliers (the "November 2005 Meeting"). At this meeting, Enzymotec explained that in October of 2005, it tested a sample of Neuro–PS and determined that although the Neuro–PS label stated that it contained 100 mg of PS–20, in reality it only contained 40 mg of PS–20. At the time of the November 2005 Meeting, NBTY was purchasing raw PS–20 from Lipogen Products (9000) Ltd. ("Lipogen"), although the parties dispute the nature and Enzymotec's knowledge of the NBTY–Lipogen relationship. Enzymotec claims that at the November 2005 Meeting, NBTY informed Enzymotec that if it could prove that Lipogen's PS was non-conforming—meaning less than 20% PS—then NBTY would enter into an exclusive purchasing agreement with Enzymotec. Although NBTY admits that it agreed it would purchase raw PS–20 from Enzymotec if it turned out the Lipogen PS–20 was non-conforming, NBTY disputes that it promised to enter into an "exclusive" supply agreement.

On December 1, 2005 the parties met again and signed a Confidentiality Agreement. Again, Enzymotec claims that at this meeting NBTY agreed that if Enzymotec could show that the Lipogen PS–20 was non-conforming, it would purchase its PS–20 requirements from Enzymotec for one year, which means it would purchase roughly 25 metric tons of PS from Enzy-

motec. Subsequently, testing was performed on the Lipogen and Enzymotec PS–20, and NBTY does not dispute that the results indicated that the Lipogen PS was non-conforming.

### C. The Parties Relationship During 2006

On February 1, 2006, the parties met and executed an agreement (the "February 2006 Agreement") which stated that NBTY would purchase 25 metric tons of PS from Enzymotec, and that Enzymotec would receive quarterly purchase orders "which will reflect the estimated quarterly consumption of PS by NBTY as business dictates." (Declaration of Robert A. Horowitz dated April 19, 2010 ("Horowitz Declaration to Amend"), Ex. A.) NBTY characterizes the February 2006 Agreement as an "Agenda" or a "Memorandum of Understanding" and not a binding agreement. To the extent it can be characterized as a binding agreement, the parties also disagree as to whether the February 2006 Agreement was meant to reflect an exclusive supply agreement between the parties, and whether it was intended to be a multi-year agreement. Enzymotec claims that NBTY agreed that if Enzymotec continued to provide a quality product the exclusive supply agreement would continue for "many, many years." (Hotam Dep. 158:25–159:3, Ex. B to the Declaration of Linda S. Agnew dated April 12, 2010 (the "Agnew Amend Declaration").) There is no dispute, however, that between June 2006 and January 2007 NBTY purchased 25 metric tons of PS–20 from Enzymotec.

Based on its belief that the parties had entered in to an exclusive supply agreement and that the agreement would extend beyond one year, assuming it could continue to produce quality PS–20 Enzymotec alleges that it "purchased vessels, expanded its plant, ordered raw materials, and recruited additional manpower." (PAC ¶ 40.) Enzymotec further alleges that in or about February 2006, Enzymotec told NBTY that one of Enzymotec's distributors took a customer away from NBTY because of the poor quality of NBTY's PS. Enzymotec states that a result of learning this information, NBTY requested that Enzymotec ask its distributors not to approach NBTY's current customers "so as not to interfere with the opportunities NBTY and Enzymotec were to have going forward." (PAC ¶¶ 42 & 43.)

Enzymotec alleges that on March 1, 2006 it first became aware of an exclusive four-year supply agreement between NBTY and Lipogen. Enzymotec asserts that the NBTY–Lipogen agreement contradicted NBTY's representation to Enzymotec that it could not enter into multi-year exclusive supply agreements. On March 3, 2006 NBTY sent Lipogen a Notice of Default based on the non-conforming PS–20, and demanded that Lipogen cure the defect within the 60 days provided by their supply agreement. Enzymotec and NBTY allegedly met again on March 31, 2006, but both parties dispute what, if any, representations NBTY made to Enzymotec regarding the future of their relationship if Lipogen was unable to cure.

On May 2, 2006, Michael C. Foley, counsel for Enzymotec, sent a letter to NBTY's CEO and President Harvey Kamil accusing NBTY of breaching the Confidentiality Agreement by sharing Enzymotec's testing techniques; breaching the February 2006 Agreement by not using Enzymotec as its exclusive supplier; and fraudulently inducing Enzymotec to provide the confidential information in order to secure a better deal from its current suppliers. In the letter, Foley stated:

> This appearance is strengthened by NBTY's failure to recall the products once it learned that they did not conform with the labeling and literature accompanying them. If NBTY really

acquired Enzymotec's knowledge and know how in order to ascertain a problem with its current supplies of PS20, it would have taken steps to recall its product once it determined they did not conform. It did not, however, according to Enzymotec's best information, NBTY's products continue to be sold to consumers throughout the United States and beyond even though they do not conform to the labeling or specifications provided by the products.

(Declaration of Robert A. Horowitz dated September 8, 2010 ("Horowitz Summary Judgment Declaration"), Ex. H at 2–3.) Foley further states that although Enzymotec believed it had grounds to bring legal action against NBTY, it preferred a business solution.

Enzymotec asserts that as a result of receiving the May 2, 2006 letter, NBTY contacted Enzymotec, assured Enzymotec that NBTY still intended to pursue an exclusive relationship with Enzymotec and that NBTY needed 60 days to determine if Lipogen could provide conforming PS under the NBTY–Lipogen contract. Thereafter NBTY conducted additional tests on the Lipogen and Enzymotec PS–20 and determined that neither Lipogen nor Enzymotec PS–20 maintained its stability under three months of accelerated conditions as required by NBTY's quality standards. Enzymotec disagreed with this finding as to its product and, after consultation with an independent assay company, NBTY allegedly confirmed that Enzymotec's PS–20 did meet the stability standards. As a result of these findings, on June 12, 2006, Enzymotec contacted NBTY and stated that because Lipogen could not provide stable PS, Lipogen had shown it is unable to cure under the NBTY–Lipogen contract and therefore Enzymotec and NBTY should execute an exclusive agreement. Enzymotec also informed NBTY that the Neuro–PS currently on the shelf at stores did not contain stable PS. Enzymotec alleges that as a result of learning this information "NBTY should have recalled the product but did not." (PAC ¶ 61.)

Throughout the remainder of 2006 the parties engaged in a number of written and oral communications regarding whether NBTY had agreed to purchase any PS–20 from Enzymotec, let alone agreed to use Enzymotec as its exclusive supplier if Lipogen was unable to cure. Despite this dispute, NBTY ultimately did purchase 25 metric tons of PS–20 from Enzymotec, although NBTY also purchased PS–20 from additional suppliers. (*See, e.g.,* Horowitz Summary Judgment Decl., Ex. F.) Finally, Enzymotec alleges that at a November 29, 2006 meeting between the parties NBTY requested that Enzymotec contribute to the cost of advertising Neuro–PS and that Enzymotec conduct a clinical trial on Neuro–PS. Although Enzymotec acquiesced to these requests, it is unclear whether Enzymotec agreed to perform these functions in exchange for an exclusive supply agreement, or based on its belief that the parties had an exclusive supply agreement.

### D. The Parties Relationship in 2007

Throughout 2007 NBTY allegedly made numerous requests for monetary contributions to their advertising costs and Enzymotec asserts that it agreed to incur these costs based on the belief that it was NBTY's exclusive PS–20 supplier. Enzymotec also alleges that on May 3, 2007, NBTY's Purchasing Coordinator suggested that Enzymotec also keep 1,500 kilograms of PS–20 in its inventory for NBTY. Enzymotec viewed this request as further confirmation that it had an exclusive supply agreement with NBTY. In mid–2007, Enzymotec conducted a clinical trial of Neuro–PS based on 15,000 Neuro–PS capsules provided by NBTY. During the clinical trial, Enzymotec alleges that it discovered that the PS–20 in the Neuro–

PS capsules it had received for the trial was not Enzymotec PS–20, meaning that NBTY was still using other suppliers.

At a July 19, 2007 meeting, the parties allegedly discussed NBTY's use of additional suppliers, and Enzymotec states that NBTY cited a stock exchange rule that prevented it from having exclusive supply agreements and that it had only placed spot orders with another supplier in order to comply with this stock exchange rule. Enzymotec further alleges that as a result of this meeting the parties reached the following oral agreement: "(1) Enzymotec will be responsible for overcoming the problem with respect to the clinical trial ...; (2) NBTY will purchase its 100 mg Neuro–PStm grade exclusively from Enzymotec (a minimum of 18 metric tons per year); (3) NBTY will purchase from Enzymotec at least 80% of its PS20, with total expected annual quantities of 25 metric tons per year" and that the parties would discuss the terms of a new supply agreement at the beginning of 2008. (PAC ¶ 90.)

Although NBTY did not place any additional orders with Enzymotec in 2007, Enzymotec states that it continued to contribute advertisement funds to NBTY. Enzymotec also alleges that NBTY stated it was not making additional purchases from Enzymotec because it had sufficient PS–20 in inventory. However, according to Enzymotec, NBTY purchased PS–20 from another supplier in December 2007. The parties further dispute what representations, if any, were made regarding NBTY's representations about its intent to purchase from Enzymotec in 2008.

### E. The Parties Relationship in 2008 and the Filing of the Instant Action

In January 2008, Enzymotec presented the clinical trial results to NBTY. Enzymotec alleges it only received one small order for 125 KG of PS–20 from NBTY in the first quarter of 2008. The parties met at least one more time between March 3, 2008 and the commencement of this action on July 1, 2008. Enzymotec alleges that at this meeting, NBTY informed it that NBTY would never have agreed to exclusively purchase PS–20 from Enzymotec or any other supplier; that price was always the primary consideration; and that except with a unique product, NBTY would not take into account a supplier's agreement to conduct a clinical trial when making purchasing decisions. Enzymotec alleges that these representations contradicted NBTY's previous representations and actions.

On July 1, 2008 Enzymotec brought this action against NBTY seeking actual damages based on NBTY's alleged fraud, negligent misrepresentation, unfair competition and breach of the confidentiality agreement, and seeking equitable damages based on the principles of quasi-contract and promissory estoppel (the "Initial Complaint"). In addition, Enzymotec alleged that NBTY violated the Lanham Act for false advertising by misrepresenting the character, nature, and quality of its products when it was aware that the label on the Neuro–PS products misrepresented that they contained 100 mg of PS–20, and yet continued to sell the products without "disclosing the problem to its customers and recalling the product." (PAC.¶ 110.)

### F. Procedural History and Enzymotec's Motion to Amend

On November 6, 2008, United States Magistrate Judge E. Thomas Boyle issued an initial scheduling order that set forth April 17, 2009 as the deadline for completing fact discovery, and May 1, 2009 as the last day to file a motion to amend the pleadings. The date to complete fact discovery was extended a number of times, and the scheduling order was amended once to alter the deadline for filing a motion to amend the pleadings to June 1,

2009. Throughout 2009 the parties attempted to settle this action, resulting in an ultimately unsuccessful mediation session on October 19, 2009. Even though the parties began to produce documents in July and August of 2009, the first deposition was not taken until January 21, 2010.

On March 24, 2010, Enzymotec filed a motion to amend the complaint to add a number of factual allegations and to add a cause of action for Breach of Supply Agreement, alleging a breach of the February 2006 Agreement and two subsequent renewals of that agreement. On August 2, 2010 discovery in this action was certified as complete and the case was marked as trial ready.

### G. NBTY's Motion for Partial Summary Judgment and Enzymotec's Motion for Leave to File a Sur–Reply

On August 20, 2010, while the motion to amend was pending, NBTY filed a motion for partial summary judgment to dismiss Enzymotec's Lanham Act false advertising claim on the grounds that Enzymotec lacked standing because it was not a direct competitor of NBTY, and that Enzymotec could not meet the legal standing requirement of showing a reasonable basis to believe it had been injured by the alleged false advertising. In opposition to the motion, Enzymotec attached twelve pages of invoices and purchase orders to a Declaration of Ariel Katz ("Katz Declaration"), nine of which had not been previously produced, in an effort to show it could assert injury as a direct competitor in the sale of soft-gel PS–20 capsules to retailers. In addition, in its opposition, Enzymotec also disputed NBTY's characterization of the theory of damages that Enzymotec had set forth in its response to NBTY's third set of interrogatories.

In its reply, NBTY requested that the Court disregard the not previously pro-duced documents, and that the Court disregard Enzymotec's theory of damages as new. Furthermore, in the Reply Declaration of Linda S. Agnew ("Agnew Summary Judgment Declaration"), NBTY included allegations of Enzymotec's discovery abuses as additional grounds for why the Court should disregard the not previously produced documents. Subsequently, on October 11, 2010, Enzymotec filed a motion for leave to file a sur-reply to respond to NBTY's requests in its reply brief, and the allegations of discovery abuses in the Agnew Summary Judgment Declaration.

The motion to amend, motion for partial summary judgment, and motion to file a sur-reply and are discussed in turn below.

## II. THE MOTION TO AMEND

On March 24, 2010, Enzymotec moved to file an amended complaint (the "Proposed Amended Complaint"), seeking to include a number of new factual allegations and a new cause of action primarily relating to NBTY's purchase of PS–20 from suppliers other than Enzymotec in violation of alleged exclusive supply agreements.

In the Initial Complaint, Enzymotec alleged that in February 2006 the parties entered into an agreement whereby NBTY agreed, among other things, to exclusively purchase its PS–20 requirements from Enzymotec for one year (the "February 2006 Agreement"). Throughout the Initial Complaint, Enzymotec states that Enzymotec understood, and NBTY continued to represent, that the February 2006 Agreement would extend beyond the one year term as long as Enzymotec could continue to supply quality PS–20. Enzymotec also states in the Initial Complaint that NBTY continued to represent that the parties had an exclusive supply agreement during 2007 and 2008.

In the Proposed Amended Complaint, Enzymotec characterizes the February

2006 Agreement as one agreement that was renewed for two additional one year terms. Enzymotec alleges that in November 2006, the parties agreed to extend the February 2006 Agreement for another year, and refers to this agreement as the February 2007 Agreement. Enzymotec also alleges in the Proposed Amended Complaint that at a meeting in January 2008, the parties agreed to extend the exclusive February 2006 Agreement for an additional year (the "2008 Agreement"). The cause of action Enzymotec seeks to add in the Proposed Amended Complaint is for Breach of Supply Agreement, which alleges that NBTY breached the February 2006 Agreement, February 2007 Agreement, and 2008 Agreement by purchasing PS–20 from suppliers other than Enzymotec (the "proposed cause of action").

Although a number of additional factual allegations are included in the Proposed Amended Complaint, NBTY primarily opposes the proposed cause of action and the facts Enzymotec alleges in support of the proposed cause of action. NBTY asserts that the Court should deny Enzymotec's motion to amend because: (1) Pursuant to Fed.R.Civ.P. 16(b), Enzymotec cannot show good cause for modifying the scheduling order that lists June 1, 2009 as the deadline for filing motions to amend the pleadings; and (2) Pursuant to Federal Rule of Procedure 15(a) Enzymotec should not be permitted to amend because of undue delay and bad faith in bringing the motion, and because NBTY will be severely prejudiced if the Court grants the motion to amend because it will incur additional discovery costs. The Court will now address each objection in turn.

**A. Whether Enzymotec has Shown Good Cause to Modify the Scheduling Order—Fed. R. Civ. P. 16(b)**

Despite a number of changes to the deadlines for completion of discovery, the operative scheduling order in this case identifies June 1, 2009 as the deadline for filing a motion to amend a pleading. Enzymotec filed the instant motion to amend on March 24, 2010, more than nine months past the deadline. As such, the Court must consider Fed.R.Civ.P. 16(b) ("Rule 16"), which "may limit the ability of a party to amend a pleading if the deadline specified in the scheduling order for amendment of the pleadings has passed." *Kassner v. 2nd Avenue Delicatessen, Inc.,* 496 F.3d 229, 243 (2d Cir.2007); *see* Fed.R.Civ.P. 16(b)(4) ("A schedule may be modified only for good cause and with the judge's consent.").

"Where a scheduling order has been entered, the lenient standard under Rule 15(a), which provides leave to amend 'shall be freely given,' must be balanced against the requirement under Rule 16(b) that the Court's scheduling order 'shall not be modified except upon a showing of good cause.'" *Grochowski v. Phoenix Construction,* 318 F.3d 80, 86 (2d Cir.2003) (quoting older versions of Rule 15(a) and Rule 16(b)). "[A] finding of 'good cause' depends on the diligence of the moving party." *Parker v. Columbia Pictures Indus.,* 204 F.3d 326, 340 (2d Cir.2000). To satisfy the good cause standard "the party must show that, despite its having exercised diligence, the applicable deadline could not have been reasonably met." *Sokol Holdings, Inc. v. BMD Munai, Inc.,* No. 05–CV–3749, 2009 WL 2524611, at *7 (S.D.N.Y. Aug. 14, 2009) (citing *Rent–A-Center Inc. v. 47 Mamaroneck Ave. Corp.,* 215 F.R.D. 100, 104 (S.D.N.Y.2003)). However, the good cause standard is not satisfied when the proposed amendment rests on information "that the party knew, or should have known, in advance of the deadline." *Id.* (collecting cases).

Enzymotec contends that it has good cause for filing a motion to amend

the complaint nine months after the scheduling order deadline, because delayed discovery and settlement negotiations deferred its ability to discover the facts supporting the proposed cause of action. According to Enzymotec, the parties spent several months after the June 1, 2009 deadline involved in settlement negotiations that ultimately concluded in an unsuccessful mediation on October 19, 2009. Enzymotec argues that although it has been aware of the February 2006 Agreement since the inception of the case, it only learned of the facts relating to NBTY's alleged breach of the agreements that serve as the basis for the proposed cause of action during discovery. Enzymotec claims that this information was uncovered from documents NBTY produced in September 2009 reflecting purchases of PS–20 from other suppliers, information from depositions of NBTY employees in February and March 2010, and documents from non-party suppliers that Enzymotec subpoenaed and received in January and February 2010. If accurate, then Enzymotec's argument that it discovered the facts underlying its new cause of action for breach of the supply agreement followed by filing a motion to amend within two months of acquiring the information is sufficient to show diligence. *Permatex, Inc. v. Loctite Corp.,* No. 03 Civ. 943, 2004 WL 1354253, at *3 (S.D.N.Y. June 17, 2004) (holding that the Plaintiff exhibited diligence by moving to amend less than two months after deposition that brought new information to light).

For its part, NBTY does not dispute Enzymotec's timeline of discovery. Rather, NBTY contends that Enzymotec's delay in making this motion is inexcusable because it has been aware of the February 2006 Agreement and therefore all the facts underlying the proposed cause of action for two years before the inception of the lawsuit in July of 2008. Thus, NBTY claims that Enzymotec cannot show good cause for failing to move to amend the complaint within the time set forth in the scheduling order.

The Court agrees with Enzymotec that the relevant analysis is not whether Enzymotec was aware of the February 2006 Agreement, but rather when Enzymotec learned that NBTY allegedly breached that agreement. Although Enzymotec may have suspected prior to filing the Initial Complaint that NBTY breached the February 2006 Agreement or any subsequent renewals of that agreement, causes of action in a complaint must be based on factual allegations, not factual speculation. Insofar as NBTY does not contest that Enzymotec learned of the alleged breaches of the February 2006 Agreement during the course of discovery, the Court is satisfied that, if the proposed amendments meet the requirements of Fed.R.Civ.P. 15, good cause exists to permit an extension of that deadline.

### B. Whether Enzymotec May Amend under Fed. R. of Civ. P.15(a)

#### 1. Legal Standard

 If a court finds that good cause for extending the deadline exists, a party still has the burden to show that the proposed amendment is permissible under Fed. R.Civ.P. 15 ("Rule 15"). Rule 15(a)(2) provides that "a party may amend its pleading only with the opposing party's written consent or the court' leave" and that "[t]he court should freely give leave when justice so requires." A court should deny leave to amend only upon "undue delay, bad faith or dilatory motive on the part of the [moving party], repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the [non-moving party,] ... [or] futility." *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *see also Aetna Cas. & Sur. Co. v. Aniero Concrete Co., Inc.,* 404 F.3d 566,

603–04 (2d Cir.2005) ("A Rule 15(a) motion should be denied only for reasons as undue delay, bad faith, futility of the amendment, and perhaps the most important, the resulting prejudice to the opposing party.") (internal quotations and citation omitted). Amendments are generally favored because "they tend to facilitate a proper decision on the merits." *Blaskiewicz v. Cnty. of Suffolk*, 29 F.Supp.2d 134, 137 (E.D.N.Y.1998). However it is ultimately "within the sound discretion of the court whether to grant leave to amend." *John Hancock Mut. Life Ins. Co. v. Amerford Int'l Corp.*, 22 F.3d 458, 462 (2d Cir.1994) (citing *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)).

## 2. Whether Enzymotec Exhibited Undue Delay or Bad Faith in Bringing the Motion to Amend

■ NBTY's first alleges undue delay and bad faith by Enzymotec in filing the motion to amend shortly before the close of discovery despite knowing of the February 2006 Agreement prior to filing the Initial Complaint. The Court has already rejected this argument and found that Enzymotec's motion to amend was timely because Enzymotec apparently obtained knowledge of the alleged breaches of the exclusive supply agreements shortly before filing the motion. Thus, the Court finds no undue delay or bad faith preventing the Court granting the motion to amend.

## 3. Whether NBTY will be Prejudiced if Enzymotec is Permitted to Amend the Complaint

■ NBTY argues that the Court should deny Enzymotec's motion to amend because NBTY will be prejudiced by the cost of additional discovery in light of Enzymotec's undue delay and bad faith. In addition, NBTY contends that the additional discovery will be prejudicial because it will result from contradictions between allegations in the Proposed Amended Complaint and Enzymotec's previous representations regarding the duration of the February 2006 Agreement.

■ In general, "the adverse party's burden of undertaking discovery, standing alone, does not suffice to warrant denial of a motion to amend a pleading." *United States v. Continental Ill. Nat'l Bank & Trust of Chicago*, 889 F.2d 1248, 1255 (2d Cir.1989). The party opposing an amendment has the burden of proving that leave to amend would be prejudicial. *See Blaskiewicz v. Cnty. of Suffolk*, 29 F.Supp.2d 134, 137–38 (E.D.N.Y.1998).

As an initial matter, the main argument NBTY proffers as to why permitting Enzymotec to amend the complaint would be prejudicial is that NBTY should not be forced to incur additional discovery costs when Enzymotec filed its motion with undue delay and in bad faith. Insofar as the Court finds there was no undue delay or bad faith, NBTY has failed to show that it would be prejudiced by the proposed amendment.

However, NBTY also asserts that the Court should reject the motion to amend because the factual allegations supporting the proposed cause of action contradict Enzymotec's previous allegations. Specifically, NBTY contends that Enzymotec previously asserted in the Initial Complaint and throughout depositions that the February 2006 Agreement was an exclusive supply agreement with a term of multiple years depending on the Enzymotec's ability to provide quality PS–20. Now Enzymotec seeks to assert that the parties renewed the February 2006 Agreement on two separate occasions. The rationale for denying a motion to amend on the ground of inconsistency is that it would unfairly prejudice the defendant and cause undue delay because "[t]o the extent that the proposed . . . amended complaint adds new or inconsistent factual allegations, new dis-

covery would be needed to allow the defendants to respond to the new facts and the new legal theory." *Reisner v. General Motors Corp.*, 511 F.Supp. 1167, 1173 (S.D.N.Y.1981). The Court agrees with NBTY that Enzymotec has been inconsistent in its characterization of the facts surrounding its allegations that Enzymotec and NBTY had exclusive supply agreements in 2006, 2007, and 2008. However, the Court finds that this inconsistency is not likely to lead to substantial additional discovery or prejudice.

In the Initial Complaint, Enzymotec alleged that oral representations and assurances supported its position that it continued to serve as NBTY's exclusive PS–20 supplier after the February 2006 Agreement. Conversely, in the Proposed Amended Complaint, Enzymotec cites a November 29, 2006 meeting where the parties allegedly agreed to extend the February 2006 Agreement for one year. Enzymotec also alleges for the first time in the Proposed Amended Complaint that at an April 2007 meeting the parties actually agreed to extend the agreement again in January 2008, as opposed to the allegation in the Initial Complaint that the parties agreed to discuss a new supply agreement in January 2008. Thus, NBTY is correct in noting that Enzymotec is not consistent as to whether its allegation that it was NBTY's exclusive supplier was based on an understanding that the February 2006 Agreement was to be ongoing throughout 2007 and 2008, or whether the parties made actual agreements to extend or renew the February 2006 Agreement.

However, the Court finds that this inconsistent characterization does not constitute grounds to reject the Proposed Amended Complaint. The Court has reviewed the Proposed Amended Complaint and finds that the new factual allegations and proposed cause of action are not an unwarranted expansion of the claims that could potentially result in substantial additional discovery. Enzymotec alleged throughout the Initial Complaint that it believed the February 2006 Agreement was an exclusive supply agreement, and that the interaction between the parties led Enzymotec to conclude that an exclusive supply agreement also existed for 2007 and 2008. The questions of whether the parties had an exclusive supply agreement or whether NBTY led Enzymotec to believe the parties had an exclusive supply agreement go to the core not only of the proposed cause of action, but the entire lawsuit.

In addition, while it is true that Enzymotec knew of the additional facts concerning the existence of actual agreements at the time it filed the Initial Complaint, the Court will not deny leave to amend the complaint to add factual support for a cause of action it was not aware of at the time the Initial Complaint was filed. The Court agrees with Enzymotec that a substantial amount, if not all of the discovery relevant to the proposed cause of action has already been concluded, and to the extent any additional discovery will be required it will, with reasonable certainty, be minimal.

Therefore, having found good cause to modify the scheduling order to permit the amendment, and having found no undue delay, bad faith, or prejudice, the Court grants Enzymotec's motion to amend the complaint.

## III. THE MOTION FOR PARTIAL SUMMARY JUDGMENT

In the complaint, Enzymotec asserts a cause of action against NBTY for false advertising in violation of Section 43(a)(1)(B) of the Lanham Act. Enzymotec alleges that the Neuro–PS and its in-store brand formulation labels stated that they contained 100 mg of PS–20, but that the

products actually contained 40 mg of PS–20. In addition, Enzymotec alleges that the PS–20 provided by suppliers other than Enzymotec did not meet NBTY's stability standards. Therefore even if Neuro–PS contained PS–20 from another supplier that initially met the 20% PS requirement, after a short amount of time on the shelf, the representation on the label would no longer be accurate. Enzymotec alleges that it made NBTY aware of the deficiency in late 2005, and that NBTY nevertheless continued to sell the products without "disclosing the problem to its customers and recalling the product." (PAC ¶ 110.) Although Enzymotec does not provide a time period for when the Lanham Act violation occurred, because Enzymotec has cited NBTY's sales figures for December 2005 through June of 2006 as the basis for damages, the Court finds that this is the relevant time period.

In response to NBTY's third set of interrogatories, Enzymotec admitted that it was unaware of any entities that reduced their purchases of PS–20 from Enzymotec as a result of the alleged mislabeling, and that it did not have any documents reflecting a decrease in sales as a result of NBTY's alleged misrepresentation. Rather, Enzymotec identified its basis for seeking damages under the Lanham Act as follows:

> Enzymotec supplies raw PS to NBTY's competitors for inclusion in those customers' retail sales of nutritional supplements containing PS. Had NBTY not misrepresented the character, nature and quantity of its Neuro–PS [tm], NBTY's sales of Neuro–PS [tm] would have decreased, causing Enzymotec's customers' sales to increase, and Enzymotec's sales of raw PS to its customers to increase.

(Agnew Summary Judgment Decl., Ex. E at 3.) According to NBTY, this response indicates that Enzymotec relies on the following chain of events to show a likelihood of injury and causation (the "decrease in sales theory"): 1) had NBTY disclosed that its products contained less than 20% PS, fewer customers would have purchased NBTY's products, 2) the resulting decrease in NBTY's sales would have induced NBTY and its competitors to increase production of products with conforming PS–20 to fill the void in the market, and therefore, 3) based on a number of factors it is reasonably likely that Enzymotec would have supplied a substantial portion of the replacement product. Conversely, Enzymotec contends that the decrease in sales referenced in the interrogatory response referred to the decrease that would have resulted if NBTY had recalled the mislabeled product (the "recall theory").

NBTY asserts that Enzymotec has not provided sufficient evidence to establish standing to bring the Lanham Act claim, and as a result the Court should dismiss the claim. As set forth below, the Court agrees with NBTY and grants the motion for partial summary judgment dismissing the Lanham Act cause of action.

### A. Standard of Review—Fed. R. Civ. P. 56

Pursuant to Federal Rule of Civil Procedure 56(c), a court may not grant a motion for summary judgment unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Globecon Group, LLC v. Hartford Fire Ins. Co.*, 434 F.3d 165, 170 (2d Cir. 2006). In determining whether an issue is genuine, "[t]he inferences to be drawn from the underlying affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to

the party opposing the motion." *Cronin v. Aetna Life Ins. Co.,* 46 F.3d 196, 202 (2d Cir.1995) (citing *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962) (per curiam), and *Ramseur v. Chase Manhattan Bank,* 865 F.2d 460, 465 (2d Cir.1989)).

If the moving party meets its initial burden of demonstrating the absence of a disputed issue of material fact, the burden shifts to the nonmoving party to present "specific facts showing a genuine issue for trial." Fed.R.Civ.P. 56(e). The nonmoving party may not then rely solely on "conclusory allegations or unsubstantiated speculation" in order to defeat a motion for summary judgment. *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998). If the evidence favoring the nonmoving party is "merely colorable ... or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.,* 477, U.S. 242, 249–50, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (internal citations omitted).

### B. Standard for Asserting Standing to bring a Claim under the Lanham Act

The scope of NBTY's motion to for partial summary judgment is limited to whether Enzymotec has standing to bring a cause of action for false advertising against NBTY under the Lanham Act. Section 43(a)(1)(B) of the Lanham Act provides in relevant part that

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

. . .

(B) in commercial advertising or promotion, misrepresents the na-

ture, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act. 15 U.S.C. § 1125. "[I]n order to establish standing under the Lanham Act, a plaintiff must demonstrate (1) a reasonable interest to be protected against the alleged false advertising and (2) a reasonable basis for believing that the interest is likely to be damaged by the alleged false advertising." *Famous Horse Inc. v. 5th Ave. Photo Inc.,* 624 F.3d 106, 113 (2d Cir.2010). "The 'reasonable interest' prong of this test includes commercial interests, direct pecuniary interests, and even a future potential for a commercial or competitive injury." *ITC Ltd. v. Punchgini, Inc.,* 482 F.3d 135, 169 (2d Cir.2007). "The 'reasonable basis' prong embodies a requirement that the plaintiff show both likely injury and a causal nexus to the false advertising." *Ortho Pharm. Corp. v. Cosprophar, Inc.,* 32 F.3d 690, 694 (2d Cir.1994). "Where a plaintiff's products are 'not obviously in competition with the defendant's products, [and] the defendant's advertisements do not draw direct comparisons between the products,' then a plaintiff must make a 'more substantial showing' of 'injury and causation' to satisfy the reasonable basis prong of the standing requirement." *ITC,* 482 F.3d at 169–70 (citing *Ortho Pharm. Corp.,* 32 F.3d at 694) (alteration in original). Exactly what type of showing is required depends on the facts and circumstances of the case, but absent direct comparison between the parties products in the alleged false advertisement, or the implication of a direct comparison, injury and causation will not be presumed.

Neither party disputes that Enzymotec can satisfy the first requirement of the

standing analysis by showing it has the type of "reasonable interest" Section 43(a) of the Lanham Act seeks to protect— namely that it is not a consumer but rather a commercial actor with a pecuniary interest potentially affected by the false advertising. However, the parties do disagree as to the significance of whether the parties were in direct competition. NBTY argues that a failure to show direct competition "provides a separate and independent ground for dismissing [the] Lanham Act claim for lack of standing." (Def. Br. at 15.) Conversely, Enzymotec asserts that as long as it can show a material issue of fact as to whether Enzymotec and NBTY directly compete, it is either entitled to the presumption that its belief in the likelihood of injury and causation is reasonable, or that it has a lower burden of production. The Court finds that neither party is correct.

Whether the parties are in direct competition is not determinative of this issue. Ultimately, the Court finds that while Enzymotec has a "reasonable interest" that could potentially be harmed by NBTY's alleged false advertising, even if that interest were the result of direct competition, Enzymotec would not be entitled to a presumption of injury and causation. The Court further finds that, regardless of whether the decrease in sales theory or the recall theory is the actual claimed basis for damages, Enzymotec has not provided enough evidence to raise a genuine issue of fact as to whether it has a reasonable basis to believe its interest was damaged by the alleged false labeling.

### 1. As to the Reasonable Interest Requirement

Enzymotec alleges three types of competitive relationships between Enzymotec and NBTY that it contends satisfy the reasonable interest prong of the standing analysis. The Court addresses each of these potential relationships below and

finds that because Enzymotec and NBTY's products compete in the marketplace, and there is at least a possibility of direct competition in the sale of PS–20 to retailers, Enzymotec has satisfied the first standing requirement of showing a "reasonable interest" to be protected by the Lanham Act.

In order to show a reasonable interest, direct competition is not necessary. However, "it is apparent that, at a minimum, standing to bring a section 43 claim requires the potential for a commercial or competitive injury." *Berni v. Int'l Gourmet Restaurants of America, Inc.*, 838 F.2d 642, 648 (2d Cir.1988). Contrary to NBTY's contention, a failure to show direct competition is not an independent ground to dismiss a Lanham Act claim for lack of standing. The NBTY argument is premised on the categorical approach to standing articulated in *Telecom International of America, Ltd. v. AT & T Corp.*, that "the plaintiff must be a competitor of the defendant and allege a competitive injury." 280 F.3d 175, 197 (2d Cir.2001). However, the Second Circuit recently rejected *Telecom's* categorical approach in *Famous Horse Inc. v. 5th Avenue Photo Inc.*, and adopted the rationale of cases that have not "*required* that litigants be in competition, but instead have viewed competition as a strong indication of why the plaintiff has a reasonable basis for believing that its interest will be damaged by the alleged false advertising." 624 F.3d 106, 113 (2d Cir.2010) (emphasis in original).

As an initial matter, to the extent Enzymotec asserts standing because both parties sell soft-gel capsules containing PS–20 to wholesalers and distributors, the Court agrees with NBTY that this relationship alone is insufficient to establish standing. The false advertising alleged by Enzymotec is that the labels on Neuro–PS and its in-store brand formulations improperly

stated that the product contained 100 mg of PS when it actually contained 40 mg of PS. The complaint does not include any allegations that NBTY falsely advertised raw PS–20 to manufacturers or soft-gel capsules containing to PS–20 to non-NBTY affiliated wholesalers and distributors. Thus, even if the parties were direct competitors in the market of selling soft-gel capsules to wholesalers and distributors, Enzymotec does not have a reasonable interest to be protected from false advertising when no false advertising by NBTY in that market is alleged.

■ Conversely, Enzymotec does have a "reasonable interest" for purposes of standing based on the fact that Enzymotec provides raw PS–20 to wholesalers and distributors, who in turn directly compete with NBTY. Because the alleged false advertising relates to NBTY's products within a market where Enzymotec is an active participant, Enzymotec has a pecuniary interest in the success of the products that incorporate its PS–20. This is sufficient to establish a reasonable interest because, even if the parties themselves are not in direct competition, their products are in direct competition in the marketplace. *See Famous Horse,* 624 F.3d at 113–14 (finding a reasonable interest to assert standing for a claim under section 43(a) of the Lanham Act because "[a]lthough Famous Horse sells at retail, and Appellees primarily sell at wholesale, the goods they sell are in direct competition in the marketplace, and Appellees' products are supplied to retailers in direct competition with Famous Horse"); *cf. PDK Labs, Inc. v. Friedlander,* 103 F.3d 1105, 1111–12 (2d Cir.1997) (holding that the reasonable interest was too remote because there was no "obvious competition" between the parties where the counter-claim plaintiff's product was still awaiting FDA approval).

In addition, Enzymotec asserts that the parties directly compete in selling soft-gel capsules to retailers. If Enzymotec's products directly compete with NBTY's products, that would also satisfy the "reasonable interest" requirement. However, neither the complaint nor Enzymotec's response to the third set of interrogatories identify this relationship as the basis for the damages sought in connection with the false advertising claim. Enzymotec attached a number of invoices and purchase orders to the Katz Declaration in opposition to the summary judgment motion that purportedly reflect that Enzymotec sold soft-gel capsules containing PS–20 directly to retailers. The few invoices Enzymotec provides as evidence that it sold competing products during the relevant time period do not identify the products, nor do they identify whether these products were sold in competition with NBTY's products. However, making all inferences in favor of the non-moving party, these invoices establish at least the possibility of direct competition between the parties.

Thus, the Court finds that Enzymotec's position as a supplier of raw material to NBTY's direct competitors, and its potential position as a direct competitor in the sale of soft-gel capsules to retailers, is sufficient to meet the first prong of the standing analysis.

**2. As to the Reasonable Basis Requirement**

■ Once a plaintiff has established a reasonable interest to be protected, they must also show that there is a reasonable basis to believe that the interest has been or will be damaged by the alleged false advertising. To make this showing, a plaintiff must establish a causal connection explaining how its interest is likely to be harmed, or was harmed, by the alleged misrepresentation. Enzymotec puts forth two arguments in response to NBTY's assertion that the record is void of any evi-

dence supporting the injury and causation requirements. First, Enzymotec contends that by showing direct competition or at least raising a material issue of fact as to whether the parties were in direct competition, it is entitled to either a presumption of injury and causation, or required to meet a lower burden of production. Second, Enzymotec argues that it has sufficiently shown a disputed issue of material fact as to whether injury occurred to overcome the motion for summary judgment. The Court will address each argument in turn.

### a. Whether Enzymotec is Entitled to a Presumption of Injury and Causation or a Lesser Burden of Production

Enzymotec asserts that NBTY cannot prevail on the motion because Enzymotec has actual proof that it directly competes with NBTY, or has at least raised a triable issue of fact as to whether it directly competes and is therefore entitled to a presumption that its belief of likely injury and causation from the alleged mislabeling is reasonable. Enzymotec further contends that, even if direct competition alone does not entitle it to a presumption, it is required to make a lesser showing of evidence to support its reasonable belief of injury and causation. However, to the extent a presumption of causation and injury or a lesser burden of production can exist upon a showing of direct competition, these exceptions are inapplicable to the facts of this case.

The Second Circuit has held that "the proof required to show injury and causation varies by circumstances" but that they " 'have tended to require a *more substantial showing* where the plaintiff's products are not obviously in competition with defendant's products, or the defendant's advertisements do not draw direct comparisons between the two.' " *Famous Horse Inc. v. 5th Ave. Photo Inc.*, 624 F.3d 106,

113 (2d Cir.2010) (citing *Ortho Pharm. Corp. v. Cosprophar, Inc.*, 32 F.3d 690, 694 (2d Cir.1994)). However, injury and causation can be presumed, without more, "where the plaintiff demonstrates a likelihood of success in showing literally false the defendant's comparative advertisement which mentions the plaintiff's product by name." *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 161–62 (2d Cir.2007) (internal quotations marks, alterations, and citation omitted); *ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 169 (2d Cir.2007) (stating that where a "defendant has drawn a direct comparison between its own product and that of the plaintiff, [the Second Circuit] [is] inclined, without much more, to find standing to bring Lanham Act claims"). The rationale for this presumption is that courts are not concerned that an injury is speculative in cases where a claim is based on a false comparative advertisement that identifies the plaintiff by name "because a false 'comparison to a specific competing product necessarily diminishes that product's value in the minds of the consumer.' " *DIRECTV, Inc.*, 497 F.3d at 162 (citing *McNeilab, Inc. v. Am. Home Prods. Corp.*, 848 F.2d 34 (2d Cir. 1988)).

This presumption is also applicable where parties are "obviously in competition," which refers not to direct competition, but to whether the products so obviously compete that even without reference by name it is clear that a false advertisement is directed towards the plaintiff's product. *Id.* ("Given the nearly binary structure of the television services market, it would be obvious to consumers that DIRECTV's claims of superiority are aimed at diminishing the value of cable—which, as discussed above, is synonymous with TWC in the areas covered by the preliminary injunction."). Furthermore, even if "more substantial showing" is not equivalent to a presumption, but rather a lesser

burden of production, Enzymotec is still required to provide specific evidence of injury and causation. *Zschaler v. Claneil Enterprises, Inc.*, 958 F.Supp. 929, 936 (D.Vt.1997) (holding on a summary judgment motion where the parties were direct competitors that the "Plaintiffs' proof requirements on injury and causation are more substantial in this case, where the advertisement in question is non-comparative, than they would be in the case of a direct comparison advertisement").

■■■ As these cases show, it is not simply direct competition that relieves a plaintiff of the burden to present evidence of a reasonable belief of injury and causation, but direct competition coupled with a false advertising claim based on comparative advertising. If a misrepresentation in labeling, such as the false advertising alleged by Enzymotec, will not necessarily influence consumers away from a product, then the injury, even to direct competitors is purely speculative. Thus, where, as here, the Lanham Act claim is not based on a comparative advertisement referencing plaintiff by name or implication "some indication of actual injury and causation is necessary to satisfy Lanham Act standing requirements and to ensure the plaintiff's injury is not speculative." *DIRECTV, Inc.*, 497 F.3d at 162 (internal quotation marks, alterations, and citation omitted). Therefore, Enzymotec was required to raise more than an issue of fact as to direct competition in order to show it has a reasonable basis to believe it was injured by NBTY's alleged mislabeling.

### b. Whether there is a Disputed Issue of Material Fact as to Causation and Injury

Here, the parties dispute whether Enzymotec relies on the decrease in sales theory or the recall theory of damages to support its reasonable basis to believe its interests, either as an indirect or direct competitor, were injured by the alleged false advertising. Regardless of which theory was the intended theory of damages, NBTY argues that neither is supported by the record. Enzymotec contends that to the extent it has shown there is a genuine dispute as to the likelihood that Enzymotec's sales of PS–20 would have increased if NBTY's products had not been mislabeled, the Court should deny NBTY's motion for partial summary judgment. As set forth below, although Enzymotec may have raised an issue of fact as to whether Enzymotec's sales would have increased if the alleged mislabeling had led to a void in the market, Enzymotec cannot overcome the summary judgment motion because it failed to show the possibility of a causal link between the mislabeling and the decrease in NBTY sales that would have led to the potential increase in Enzymotec's sales.

#### i. As to the Likelihood of Injury

NBTY's asserts that Enzymotec cannot establish a reasonable basis for its belief of likely injury because it cannot show a decrease in sales, nor does Enzymotec provide sufficient evidentiary support that under either damages theory a void in the market would have resulted in an increase in sales. Enzymotec asserts that it has raised a genuine issue of fact as to whether a recall of Neuro–PS and its in-store brand formulations would have resulted in an increase in Enzymotec's sales because: 1) Enzymotec is one of four major manufacturers of PS–20, 2) Enzymotec has a 30% market share, 3) between 2005 and 2007 Enzymotec was the only PS–20 manufacturer that could supply stable PS, 4) Enzymotec had an exclusive purchase agreement with NBTY, and 5) Enzymotec directly competed against NBTY in the sale of soft-gel capsules to retailers. However, the only evidentiary support offered by Enzymotec to support a likelihood of

injury is that NBTY, whether or not it had an exclusive purchase agreement with Enzymotec, did purchase 25 metric tons of PS–20 from Enzymotec in 2006.

■ "A defendant does not have to introduce evidence that would negate the possibility of damages in order to move for summary judgment ... [r]ather, ... the burden [is] on [the plaintiff] to produce evidence of damages." *Vaughn v. Consumer Home Mortg. Co., Inc.,* 297 Fed. Appx. 23, 27 (2d Cir.2008). However, in the context of a Lanham Act claim, "[w]hile a plaintiff need not demonstrate that it has, in fact, 'lost sales because of the defendant's advertisements,' to establish standing, it must demonstrate 'the likelihood of injury and causation ... in some manner.'" *ITC Ltd. v. Punchgini, Inc.,* 482 F.3d 135, 169–70 (2d Cir.2007) (citing *Ortho Pharm. Corp.,* 32 F.3d at 694).

Although NBTY and Enzymotec may have been direct competitors in the sale of soft-gel capsules to retailers, Enzymotec has not provided any evidence that it would have experienced an increase in sales from those retailers had NBTY recalled Neuro–PS and its in-store brand formulations. The invoices and purchase orders attached to the Katz Declaration that purport to show the parties are in direct competition do not, standing alone, establish a reasonable basis for competitive injury. The Court notes that of the invoices that fall within the relevant time period, they do not show what products were sold at retail or even in what country the products were sold. Absent any affidavit or evidence beyond Enzymotec's assertions, there is no indication that these retail clients purchased from NBTY, and, had they been aware of the lower quality PS–20 in NBTY's products, would have increased their purchases from Enzymotec.

In addition, although ultimately the Court finds that Enzymotec provides evidence that it may have experienced an increase of sales to NBTY, the rest of Enzymotec's arguments as to why NBTY's competitors would have increased purchases from Enzymotec are unsupported. As an initial matter, Enzymotec has not identified a single product by an NBTY competitor that contained Enzymotec PS–20. However, Enzymotec's argument does not rely solely on an increase in production from existing customers, but an increase in production from NBTY and all of its competitors. Enzymotec argues that because the NBTY recall would have been because of non-conforming PS–20, it would experience an increase in sales because it was one of four major manufacturers of PS–20, it had 30% market share, and it was the only supplier of PS–20 between 2005 and 2007 that could provide stable PS–20. Even assuming Enzymotec is one of four major manufacturers of PS–20, Enzymotec did not offer any evidentiary support that it had 30% market share—let alone define the market—or that it was the only manufacturer between 2005 and 2007 that could provide stable PS–20. At most the evidence shows that there is a genuine dispute as to whether Lipogen could provide stable PS–20, but Enzymotec does not provide any evidence relative to the other two major manufacturers. However, based on NBTY's purchase of 25 metric tons of PS–20 from Enzymotec in 2006, at the very least the Court can infer that had NBTY recalled Neuro–PS and its in-store brand formulations, NBTY may have increased in purchases from Enzymotec. Thus, Enzymotec is correct that a genuine issue of fact does exist as to whether it would have experienced an increase in sales had the alleged mislabeling of Neuro–PS and its in-store brand formulations led to a void in the market.

### ii. As to the Likelihood of Causation

 A reasonable basis to believe the likelihood of injury for purposes of Lanham Act standing also requires that the injury not be speculative. In order to show an injury is not speculative, a plaintiff must provide evidence of a causal connection between the alleged mislabeling and the potential injury. In this case, Enzymotec's asserted damage—the denial of an increase in sales—could only occur if the alleged mislabeling led to a void in the marketplace. As previously noted, there are two potential theories of damages that Enzymotec relies on to explain how the alleged mislabeling would lead to that void: the decrease in sales theory and the recall theory. Regardless of whether Enzymotec bases this claim on the indirect relationship as a supplier of raw materials to wholesalers and distributors, or on the alleged directly competitive relationship as provider of soft-gel capsules to retailers, Enzymotec cannot prevail on the decrease in sales theory because it fails to provide any proof that NBTY's direct competitors were injured by the mislabeling, and Enzymotec cannot prevail on the recall theory because it fails to provide any evidence that the recall should have occurred.

Even where the plaintiff's reasonable interest is based on direct competition or competition in the marketplace, the plaintiff is still required to "prove a likelihood of injury" by "show[ing] a logical causal connection between the alleged false advertising and its own sales position ... with specific evidence." *Johnson & Johnson v. Carter-Wallace, Inc.*, 631 F.2d 186, 190 (2d Cir.1980); *PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105, 1112 (2d Cir. 1997) ("Neither alleged pecuniary interest supports standing in this case. Even if we assume they constitute reasonable interests under our Lanham Act jurisprudence, Friedlander has not demonstrated a "reasonable basis" for his belief that PDK's advertising injures his interests."). "The rule in this Circuit, therefore, is that a plaintiff 'must submit proof which provides a reasonable basis' for believing that the false advertising will likely cause it injury.'" *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 161 (2d Cir. 2007) (quoting *Coca-Cola Co. v. Tropicana Prods., Inc.*, 690 F.2d 312, 316 (2d Cir. 1982)). In addition, because Enzymotec seeks damages and not an injunction, Enzymotec is required to show more proof of its "reasonable belief" of the likelihood of injury and causation than would otherwise be required when requesting injunctive relief. *See Johnson & Johnson*, 631 F.2d at 190 ("On the one hand, despite the use of the word "believes," something more than a plaintiff's mere subjective belief that he is injured or likely to be damaged is required before he will be entitled even to injunctive relief.").

On a motion for summary judgment on a Lanham Act claim, a plaintiff does not have to indisputably prove the harm, but as the Second Circuit has held, "[a] plaintiff must submit specific evidence that the defendant's advertising causes direct harm to the product in which the plaintiff claims a pecuniary interest." *PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105, 1112–113 (2d Cir.1997). Where, as here, the moving party is relying on the absence of evidence to prevail on a summary judgment motion, the plaintiff's burden of production is *de minimis*. *Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 17 (2d Cir.1995). However, mere "conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir.1996). As discussed in detail below, Enzymotec has failed to meet even the *de minimis* burden of production in opposition to this summary judgment motion by failing to introduce any evidence corrobo-

rating either the decrease in sales theory or the recall theory of damages.

As an initial matter, although the Court still addresses the decrease in sales theory, by abandoning any argument relating to the decrease in sales theory, Enzymotec essentially conceded that knowledge of the mislabeling alone would not have led to a decrease in sales and caused the injury. Even if, as Enzymotec claims, there is a genuine dispute as to whether Enzymotec's sales would have increased, Enzymotec does not provide any evidence that, were customers aware of the mislabeling, NBTY's sales would have decreased. Without evidence supporting this causal connection, Enzymotec's potential injury is purely speculative. *See Zschaler v. Claneil Enterprises, Inc.*, 958 F.Supp. 929, 936–37 (D.Vt.1997) (holding on a summary judgment motion that "Plaintiffs have failed to demonstrate a causal link between their alleged losses and Defendants' advertising. Mr. Koppel's statements do not address the causation issue, and Plaintiffs have not adduced any other showing of causation, such as market studies, or customer surveys indicating the likelihood of confusion resulting from Defendants' advertisements, as required by *Ortho* ").

The only evidence provided in support of this theory is a factual allegation in the complaint that one of Enzymotec's distributors told Enzymotec that one of their customers had chosen not to purchase NBTY's product because of the low quality of PS–20. (PAC ¶ 42.) This vague allegation based on hearsay about an unnamed customer cannot overcome a motion for summary judgment. *See PDK Labs*, 103 F.3d at 1113 (holding that the counterclaim plaintiff's argument, without any affidavits or documentary evidence, that he was damaged because he licensed his product to an unnamed company that was in direct competition with the counter-claim defendant, was insufficient because he had

"not shown that [the counter-claim defendant's] products or advertising affect sales of this unnamed consumer product in any way").

As to the recall theory, Enzymotec did not need to show that knowledge of the mislabeling would have led to a decrease in sales—because the entire product would have been removed from the market. However, the Court ultimately finds that the recall theory is unsustainable because Enzymotec has offered no evidence to support the causal connection between its "reasonable interest" and the potential injury, namely that a recall should have occurred. To establish the causal connection Enzymotec needed to show the recall was more than "hypothetical," meaning that NBTY had either represented that it would recall the mislabeled products, or that a recall was required by a rule or regulation. Enzymotec only states that it "thought" a recall would have been NBTY's proper course of action once it learned that its product has less than 20% PS, and that once that recall occurred, the result would have been a substantial void in the market that would likely have been filled, at least in part, by Enzymotec. (Opp. Br. at 14.) In addition, the factual allegations in the complaint that mention a potential recall also indicate Enzymotec's expectation of a recall as opposed to alleging an agreement by NBTY to recall the product. (PAC ¶¶ 6 1, 110.)

In fact, the evidence provided by Enzymotec indicates that NBTY never agreed to a recall, and never stated that it would recall non-conforming products. Enzymotec discussed the recall, not NBTY. For example, in a May 2, 2006 letter from Enzymotec's counsel Michael C. Foley to NBTY's CEO and President Harvey Kamil, Foley stated that "[i]f NBTY really acquired Enzymotec's knowledge and know how in order to ascertain a problem

with its current supplies of PS20, it would have taken steps to recall its product once it determined they did not conform." (Horowitz Decl., Ex. H at 2.) Furthermore, Enzymotec does not allege that NBTY agreed to recall non-conforming PS–20, but rather that NBTY had agreed that "it would stop purchasing from Lipogen and switch to Enzymotec as its exclusive supplier of PS–20." (Katz Decl. ¶ 6.) Moreover, Enzymotec does not cite any rule or regulation that would have required NBTY to recall the products rather than take some other action to cure the alleged problem.

Finally, the Court finds it troubling that Enzymotec admits in the complaint that they knowingly kept the mislabeling quiet so that it would not harm NBTY's customer base and therefore Enzymotec's future financial interest. (PAC ¶ 113.) It appears that Enzymotec was hedging its bets on the outcome of its negotiations with NBTY. Either the customer base remained intact and Enzymotec could profit from the failure to disclose the mislabeling either through a recall or some other cure, or, if the deal fell through, Enzymotec could attempt to claim, as it does in the instant action, that it was injured by the mislabeling. If Enzymotec truly thought it was being injured by the mislabeling or that a recall was required, it could have sought injunctive relief. The fact that Enzymotec not only failed to take an action but explicitly chose not to act for its own potential future benefit, undermines its claim that it was injured by NBTY's mislabeling.

## IV. THE MOTION FOR LEAVE TO FILE SUR–REPLY DECLARATION

Enzymotec has sought leave from this Court to file a sur-reply declaration on NBTY's motion for partial summary judgment that it states is necessary to respond to new arguments made by NBTY in its reply brief and the Agnew Summary Judg-

ment Declaration relating to discovery abuses and requesting that the Court disregard the newly produced documents and the allegedly new recall theory of damages. As noted above, the Court ultimately found that the previously not produced documents and the recall theory of damages do not alter the outcome of the disposition of the motion. Therefore the Court does not deem it necessary to address whether the Court should have disregarded the newly produced documents or the recall theory of damages. In addition, the allegations of discovery abuses in the Agnew Summary Judgment Declaration are of no consequence to the partial summary judgment motion, and therefore there is no need for the Court to consider a sur-reply that is only seeking to clarify a perceived mischaracterization as opposed to address new arguments. Thus, because the Court has chosen to consider the additional documents and Enzymotec's theory of damages regardless of whether they were improperly presented for the first time in Enzymotec's opposition, the plaintiff's motion for leave to file a sur-reply is denied as moot.

## V. CONCLUSION

For the above stated reasons, it is hereby:

**ORDERED,** that Enzymotec's motion to amend the complaint is granted, and it is further

**ORDERED,** that NBTY's motion for partial summary judgment dismissing the first cause of action for violating section 43(a) of the Lanham Act is granted, and it is further

**ORDERED,** that Enzymotec's motion to file a sur-reply is denied.